ATCHISON, T. & S. F. RY. CO. et al. v. ARIZONA GROCERY CO.

SOUTHERN PAC. CO. et al. v. SAME.

No. 6284.

Circuit Court of Appeals, Ninth Circuit.

March 23, 1931.

A. B. Baker, L. B. Whitney, L. H. Chalmers, H. M. Fennemore, and Thomas G. Nairn, all of Phœnix, Ariz., E. W. Camp, of Los Angeles, Cal., and James L. Lyons and A. Burton Mason, both of San Francisco, Cal. (R. S. Outlaw and Gerald E. Duffy, both of Chicago, Ill., of counsel), for appellants.

Fred J. Elliott and Frank L. Snell, Jr., both of Phœnix, Ariz., for appellee.

Felix T. Smith and Samuel L. Wright, both of San Francisco, Cal., Paul M. Gregg, and Jerry H. Powell, both of Los Angeles, Cal., and Allan P. Matthew, F. F. Thomas, Jr., and John O. Moran, all of San Francisco, Cal. (Pillsbury, Madison & Sutro and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., of counsel), amici curiæ.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

WILBUR, Circuit Judge.

This is an appeal from the judgment of the District Court enforcing a reparation order of the Interstate Commerce Commission. The reparation order was made in a proceeding before the Interstate Commerce Commission entitled Traffic Bureau of Phœnix Chamber of Commerce et al. v. Atchison, Topeka & Santa Fé Railway Company, No. 16742. The record of the decision is found in the reports of the Interstate Commerce Commission (140 I. C. C. 171.) The Interstate Commerce Commission in this proceeding declared the existing rate charged by the railway company to be unreasonable and unjust, fixed a future rate which it declared to be reasonable and just upon shipments of sugar in carload lots of 73 cents per 100 pounds from all points in Northern California, and 71 cents per 100 from points in Southern California, to Phœnix, Ariz. It declared the existing rates charged by the carriers to be unreasonable and unjust and awarded reparations in the amount subsequently incorporated in the judgment of the District Court, from which the railroad companies, hereinafter designated as appellants, take this appeal. No attack is made on this appeal as to the reasonableness of freight rates fixed in the order of the Interstate Commerce Commission for the future. Nor is it denied that the law authorizes the Interstate Commerce Commission, upon declaring a freight rate unreasonable and unjust, to order reparations in favor of shippers damaged by reason of the excessive rates previously charged them. Appellants' attack upon the order of the Interstate Commerce Commission awarding reparations, and upon the judgment of the District Court enforcing such reparations, is based upon the claim that the rates charged by them previous to the order of the Interstate Commerce Commission were Commission-made rates, and that while the Commission would have a right to award reparations as against an unjust or unreasonable rate fixed by the carrier, it had no power to award reparations upon finding that a rate fixed by the Commission was excessive, for the reason that such rates were conclusively presumed to be just and reasonable until changed by the Commission, and that such change must be prospective and not retrospective. Before discussion of the points raised by the appellants, and the answers thereto by appellee, further facts with relation to the controversy should be stated.

The above-mentioned decision of the Interstate Commerce Commission (140 I. C. C. 171) was the third in a series of decisions by the Commission dealing with the freight rates on sugar transported from California to Arizona points over the Atchison, Topeka & Santa Fé Railway Company's lines, and also those of the Southern Pacific Company. These cases are referred to in the briefs as the first, second, and third case.

In the first case, entitled Traffic Bureau of Phœnix Chamber of Commerce v. Director General et al., 62 I. C. C. 412, the Commission, on June 22, 1921, fixed the freight rate on sugar from all points in California to Phœnix, Ariz., at not exceeding 96½ cents. In view of the importance of the findings and order of the Interstate Commerce Commission in the first case we quote a portion of the opinion as follows: "We find that the rates attacked were, are, and for the future will be, unreasonable to the extent that they exceeded, exceed, or may exceed 96.5 cents."

In pursuance of this finding an order was entered June 22, 1921, prohibiting the carriers from publishing or collecting their present rates for the transportation of sugar in carload lots from California points to Phœnix, Ariz., and it was further ordered: "That said defendants, according as they participate in the transportation, be, and they are hereby, notified and required to establish, on or before September 17, 1921, upon notice to this Commission and to the general public, by not less than five days' filing and posting in the manner prescribed in section 6 of the Interstate Commerce Act, and thereafter to maintain and apply to the transportation of sugar in carloads from California points to Phoenix, Ariz., rates which shall not exceed 96.5 cents per 100 pounds. It is further

ordered that this order shall continue in force until the further order of the Commission."

In pursuance of this order the carriers established a rate, effective September 17, 1921, of 96 cents per 100 pounds. On July 1, 1922, they reduced this rate 10 per cent. in conformity with the recommendation of the Interstate Commerce Commission in its opinion entitled Reduced Rates 1922, 68 I. C. C. 676. The rate for sugar in carload lots from California points to Phœnix was thus fixed at 86.5 cents. On January 10, 1924, by voluntary order of the carriers, they fixed a new tariff rate of 84 cents. This change to the 84-cent rate was due to the change of the main line rates owing to the withdrawal of long and short haul relief asked for by the carriers from the Interstate Commerce Commission. Phœnix, although on a branch line, was given the benefit of the readjustment along the main line of the Southern Pacific. The shipments of sugar involved in this proceeding were transported between February 21, 1923, and February 10, 1925, during the period when the rates fixed by the carriers was either 86.5 or 84 cents per 100 pounds.

In Traffic Bureau Phœnix Chamber of Commerce v. A., T. & S. F. R. Co., 95 I. C. C. 244, decided January 6, 1925, the Interstate Commerce Commission fixed the rate on sugar from the California points to Phœnix at not exceeding 71 cents per 100 pounds. It also decided that the complainants were entitled to reparations upon past shipments to the extent that charges theretofore paid by them exceeded the new rate. The order in pursuance of the findings in the second case was substantially in the phraseology of the order of the first case. The carriers were directed to cease collecting their present rates and to establish, before February 25, 1925, new rates "from all points in California to Phœnix, Arizona, rates which shall not exceed 71 cents per 100 pounds, minimum 60,000 pounds." It is also provided that the order shall continue in force until the further order of the Commission.

No order for the payment of reparations was made in the second case. The case was subsequently consolidated with the third case, wherein the rates were fixed at 73 cents from Northern California and 71 cents from Southern California to Phœnix, as aforesaid. Reparations were finally ordered upon the basis of the findings in the third case and the period covered by the reparations ordered and involved in this decision, as already pointed out, is between the 21st day of February, 1923, and the 10th of February, 1925. That

is to say, is within the period between the 21st of January, 1923, and the effective date of the order in the second case. The petition for relief in the second case having been filed on November 3, 1922, the period in which reparation is involved was subsequent to the inception of the proceedings in the second case and prior to the effective date of the order rendered in the case.

Appellee's answer to the contention of the appellants is that the order of the Commission in the first case, fixing a maximum rate of 96.5 cents, was not a fixing of a just and reasonable rate, but that it was the duty of the carrier by its published tariffs to fix a rate which was just and reasonable, not exceeding the maximum rate fixed by the Commission. Therefore, it is claimed the rate attacked in the subsequent proceeding before the Interstate Commerce Commission was not a rate fixed by that Commission, but one fixed by the carrier, and if the rate so fixed by the carrier was in fact unjust and unreasonable, the Commission in the subsequent case had a right to declare the rate charged by the carrier to be unjust and unreasonable and order reparations for the excessive charges of the past as well as to fix a rate for the future which it deemed to be just and reasonable. It is also contended, as we understand it, that even if the decision of the Commission in the first case is held to be a fixing of a just and reasonable rate, nevertheless the rate thus established for the future was established in the exercise of the quasi-legislative power of the Commission and is not res judicata, and that upon the complaint of a shipper claiming to be damaged by the rates charged by the carriers, the Commission, acting in a quasi judicial capacity, can review its action theretofore taken in its quasi legislative capacity, can determine that the findings so made by it in its quasi-legislative capacity were erroneous, the rate established unreasonable and unjust, and render judgment in favor of the shipper for the difference between the rate as found by the Commission in its quasi legislative capacity and the rate found by it in its quasi judicial capacity to be reasonable and just. In this connection it may be of assistance to state the position of the Interstate Commerce Commission as disclosed by its opinion in the third case: "Defendants contend that they should not be required to pay reparation on shipments which moved under rates approved or prescribed by us. We have several times announced that the doctrine of res adjudicata is not applied by us. Goss v. Director General, 73 I. C. C. 649. We re-

serve the right, upon a more comprehensive record, to modify our previous findings, whether in the same or a previous case, upon matters directly in issue before us as to which it clearly appears that our previous findings would not accord substantial justice under the laws which we administer. We have such a case here. For the first time the record before us is comprehensive in the evidence which it contains bearing upon the reasonableness of the rates assailed. Upon this record we reach the conclusion that the rate prescribed in the first Phoenix case, during the period embraced in these complaints, was unreasonable and that a lower rate would have been reasonable during that period. If we are within our authority in finding that a lower rate would have been reasonable, then it must follow that shippers who paid the freight charges at the higher rate paid charges which were unreasonable, and are entitled to reparation upon adequate proof that they paid or bore such charges."

■■ It will be observed that the power of the Commission, as stated in the portion of the opinion just quoted, is not based upon the theory that the rate established in the previous order was anything other than what was then declared to be a just and reasonable rate. In other words, no distinction such as is claimed by the appellee was made by the Commission. It assumed in its opinion that the rate theretofore established by it, under the evidence then before the Commission, was determined by them to be a just and reasonable rate, but the Commission concluded that with more ample evidence, and after a more extensive investigation, its first decision was erroneous. It therefore redetermined the question of the reasonableness of the rate as fixed in its previous order as a just and reasonable rate and decided that the carriers, in exacting the rate thus fixed by the Commission, had exacted an excessive and unreasonable and unjust rate and for that reason must reimburse the shippers from whom the rates were exacted. So far as the opinion of the Commission is concerned, no distinction is made between its power to fix rates which are just and reasonable and its power to fix maximum rates. As this is one of the basic questions in the case at bar, we pause here to say that we are in accord with the apparent conclusion of the Commission that its order fixing a maximum rate was in legal effect a determination by the Commission in its administrative or quasi legislative capacity of a reasonable and just rate and that the carrier in establishing its tariffs as required by the

Commission was justified in fixing its various rates within the maximum thus established and that the order of the Commission amounted to a decision that rates fixed by the carrier below the maximum it had established were just and reasonable. It would be absurd, it seems to us, to say that the Commission was empowered to prohibit the further collection of a freight rate established by the carrier on the ground that it was unjust and unreasonable and to replace that rate with another rate which was also unjust and unreasonable, that is, not just and not reasonable. The statute does not authorize or suggest the imposition of tentative rates pending an investigation or of rates pendente lite in an investigation. Its power in the first place is to declare a rate unreasonable and unjust, and having so declared to replace it with a rate which is reasonable and just. It should be stated at this juncture that the contention of the appellee is based upon the language of section 15, subdivision 1 (49 USCA § 15, subd. 1), with relation to the fixing of rates for the future. This subdivision of section 15 is a very long and complex sentence. It contains the following clause: " * * * The commission is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged (or, in the case of a through route where one of the carriers is a water line, the maximum rates, fares, and charges applicable thereto), and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation or transmission other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed."

The appellee places the phrase, "or the maximum or minimum, or maximum and minimum, to be charged," in opposition to the individual rate to be prescribed as just and reasonable. We think the phrase "just and reasonable" applies throughout the whole portion of the sentence involved in rate mak-

ing, and therefore applies to the maximum or minimum or to the maximum and minimum, as the case may be. Otherwise, it would be absurd to provide that the carrier should thereafter be compelled to conform to the order of the Commission. The whole purpose of the act was to create and compel the enforcement without discrimination of rates which were just and reasonable. In our opinion the provisions in regard to the maximum or minimum rate were largely for the convenience of the Commission in dealing with the extremely intricate question of freight rates. In the case at bar freight rates were involved from a number of California points to a number of Arizona points. The Commission did not undertake to fix the rates from each separate point in California to each separate point in Arizona, but made a blanket order fixing a maximum rate, and not only authorized but directed the carrier to establish its rates within that maximum. In so doing it was incumbent upon the carrier to conform to certain principles in rate-making, including, perhaps, the principle of long and short haul. In this connection it should be observed that when the Hepburn Act was passed, in 1906 (34 Stat. 589, § 4), section 15, with regard to the fixing of future rates, authorized the Commission "to determine and prescribe what will be the just and reasonable rate or rates, charge or charges, to be thereafter observed in such case as the maximum to be charged; and what regulation or practice in respect to such transportation is just, fair, and reasonable to be thereafter followed"; and to provide that the carrier should not thereafter collect any rate or charge for such transportation in excess of the maximum rate or charge so prescribed. This act was amended by the Mann-Elkins Act, June 18, 1910 (36 Stat. 551, § 12), by extending the clause to cover individual or joint rates, as follows: "* * * The commission is hereby authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate or rates, charge or charges, to be thereafter observed in such case as the maximum to be charged, and what individual or joint classification, regulation, or practice is just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the commission finds the same to exist, and shall not thereafter publish, demand, or collect any rate or charge for such transportation or transmission in excess of the maximum rate

or charge so prescribed, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed. * * * * "

It was thus evidently contemplated by Congress that the Commission would not fix a particular rate to the exact cents to be collected by the carrier, but should in every case fix a rate which is the maximum rate which the carrier can charge. This was the legislative method pointed out by Congress to the Commission for fixing by it of freight rates. It is true that the language of the subsequent amendment now in force and hereinabove quoted, taken alone and without considering the cardinal purpose of the act, might lead to the conclusion that the Commission might either fix a just and reasonable rate or a maximum rate, but in view of the history of the legislation and its cardinal purpose it is clear that the maximum rate to be fixed by the Commission must be a reasonable rate. In this connection it should be observed that in the numerous decisions by the courts considering the question of freight rates before the enactment of section 15 in its present form (Act Feb. 28, 1920, 41 Stat. 484 [49 USCA § 15]), the court has invariably referred to the administrative power of the Commission as a power to fix rates that are reasonable. No other thought has apparently entered the mind of the judges who are so frequently called upon to pass upon the power of the Commission under the Hepburn Act and the amendments thereto. Chicago, R. I. & P. Ry. Co. v. U. S. (D. C., 1925) 6 F.(2d) 888; Houston Cotton Exch. v. A. & A. R. R. Corp. (1924) 87 I. C. C. 392; Id., 93 I. C. C. 268; Chicago, R. I. & P. Ry. Co. v. U. S. (1927) 274 U. S. 29, 47 S. Ct. 486, 71 L. Ed. 911; Montrose Oil Ref. Co. v. St. L.-S. F. Ry. (D. C., 1927) 25 F.(2d) 750; Id. (1923) 78 I. C. C. 572; Id. (1924) 95 I. C. C. 96; Mellon v. World Pub. Co. (C. C. A. 1927) 20 F.(2d) 613; World Pub. Co. v. Director General (1919) 53 I. C. C. 491.

It is clear that a blanket order fixing a maximum rate from a state as large as California to an adjoining state might result in individual rates that would be in fact unreasonable and unjust. For instance, if a sugar factory were established on the west bank of the Colorado river it would be unreasonable, no doubt, to charge the maximum rate for transporting sugar across the river to Yuma, Ariz., but the Commission was bound to consider such a possibility in fixing its maximum rate, and no doubt did so. If new conditions arose later which rendered rates

fixed by the carrier unreasonable, the shipper affected could ask for the establishment of a new rate. The Commission could then re-examine the situation and establish a new rate, but there is no reason why an allowance of reparations should be made. The shipper's remedy would be a seasonable application for a change of rate before any serious damage had been suffered.

■ The contention is that the Commission could revise its original findings as to what was in fact a reasonable rate because in the first instance it acted as a law-making body (a legislature), and in the second it acted in a judicial capacity (as a court). Let it be granted that the Commission in awarding reparations acted judicially, as has been so often said (Baer Bros. Mercantile Co. v. Denver & R. G. R. R. Co., 233 U. S. 479, 34 S. Ct. 641, 58 L. Ed. 1055; Great N. Ry. Co. v. Merchants' Elevator Co., 259 U. S. 285, 291 42 S. Ct. 477, 66 L. Ed. 943); let it be granted, also, that in fixing a reasonable rate for past transactions as a basis for its award of reparations it also acted judicially, as has also sometimes been said (Great No. Ry. v. Merchants Elevator Co., supra). What follows? Is it not true that a court is bound in its determination by the law? Consequently, if the court finds that a rate has been fixed by law, by the Legislature, it must apply that law as a measure of right, and award as excessive only such charges as exceed the rate fixed by law. The Interstate Commerce Act (section 16, subd. 1 [49 USCA § 16, subd. 1]), delegating power to the Commission to award reparations, limits that power to parties "entitled to an award of damages under the provisions of this chapter [act] *for a violation thereof.* * * *" (Italics ours.) Is the court (the Commission in its quasi judicial capacity) to say that a carrier has no lawful right to collect a rate established by law (that fixed by the Commission acting in its quasi legislative capacity), or, having collecting it, to retain it? It is true that the original order is not res judicata, but its effect is quite as final, it is a legislative fiat, good, if constitutional, in all courts and at all times until changed by the Legislature.

These considerations point to a clear distinction between Commission-made rates, that is, legislative rates, and those established by the carrier. In the latter case, however, we have also a legislative declaration by Congress that all rates established by the carrier must be just and reasonable (Interstate Commerce Act, § 1, subds. 4, 5 [49 USCA § 1,

subds. 4, 5]) and declaring that all rates which are "unjust and unreasonable" are "prohibited" and "unlawful." It may be said in a broad sense that Congress itself by this enactment has fixed "just and reasonable rates" as those allowed to be charged and collected and has permitted the carrier in the exercise of its business responsibilities to tentatively ascertain and fix such reasonable rates, subject to supervision and revision by the Commission in case of error. The carrier who fixes and charges excessive rates does so with the knowledge that its judgment is to be revised, and reparations awarded, if necessary to reduce such rates to what is just and reasonable. It is permitted to judge its own case in the first instance in fixing its rates, but does so in view of and because of such power of supervision and reparation in the Commission. When, however, in regularly pursuing its delegated power, the Commission establishes a specific rate as reasonable in fact, the legislative power has so definitely established the specific rate thus fixed as just and reasonable that there is no longer room for judicial decision as to what is a just and reasonable rate. Congress, through its agent, the Commission, has established the measure by which the reasonableness of the rate is to be judged. In considering an application for damages for charging unreasonable rates, a court, or the Commission acting as such, must confine its inquiry to the other factors involved in an award of reparations, such as the amount of freight moved, the point of origin and of delivery, the owner of the shipment, etc., but if there is no excess charge there can be no award, for where the rate is one fixed by law it is not excessive in any legal sense. Indeed, although the appellee insists that the fixing of rates as a basis of reparation for past shipments is a judicial or quasi-judicial act, it would be better, perhaps, for its position if the act were legislative, for a legislative body, unlike a court, can establish the law retroactively unless prevented by constitutional limitations. The fixing of a past rate by the Commission for purposes of awarding reparations certainly has some of the attributes of a legislative act, notably that it is of universal application to all past transactions, whether the shippers are parties to the proceedings or not. It is binding upon both the carrier and its shippers, and this because any other rule would destroy uniformity, which the act endeavors to establish and maintain. See discussion in Mitchell Coal & Coke Co. v. Penna. R. Co., 230 U. S. 247, 258, 259, 264, 265, 33 S. Ct. 916, 57 L. Ed. 1472. If the second fixing or

refixing of the rate by the Commission as a basis for reparations is legislative, the only limits upon a retroactive act, other than the Constitution, would be the limitations of the Interstate Commerce Act defining the powers delegated to the Commission. The only constitutional restriction upon the legislative power to retroactively reduce rates suggested by the appellant is the constitutional prohibition against the taking of property without due process of law. That is, it is argued, the Commission, having established a legal and lawful rate, the freight charges thus fixed, allowed and collected become the property of the carrier and cannot by a new retroactive law be arbitrarily taken away by legislative fiat. This position seems to be well taken. See Fletcher v. Peck, 6 Cranch (10 U. S.) 87, 135, 3 L. Ed. 162; Blodgett v. Holden, 275 U. S. 142, 48 S. Ct. 105, 72 L. Ed. 206; Twining v. New Jersey, 211 U. S. 78, 29 S. Ct. 14, 53 L. Ed. 97; Hurtado v. California, 110 U. S. 516, 4 S. Ct. 111, 292, 28 L. Ed. 232; Calder v. Bull, 3 Dall. (3 U. S.) 386, 1 L. Ed. 648, cited by appellant, where the subject of the constitutional limitation upon retroactive legislation is considered by the Supreme Court. That is to say, whether we regard the power of the Commission in establishing a just and reasonable rate as a basis of reparations as a judicial power or as a legislative power, in either event rates established by the legislative power and collected by the carrier cannot be taken from it because it is subsequently determined to be excessive, whether the belated determination is by court or legislature, or, to use the phrases more commonly applied to the acts of the Commission, whether such subsequent determination is quasi-legislative, administrative or quasi judicial— in either event a rate established by law—lawful when charged, remains lawful when attacked later by the shipper. The view we have expressed is supported by all the decisions of state courts construing laws establishing rate-regulating bodies having power to grant reparations for excessive rates charged by the carrier. Missouri-K. & T. Ry. Co. v. Railroad Commission of Texas (Tex. Civ. App.) 3 S.W.(2d) 489; Id. (Tex. Com. App.) 13 S.W.(2d) 679, 680; Mathieson Alkali Works v. N. & W. Ry. Co., 147 Va. 426, 137 S. E. 608; Miller Mill Co. v. L. & N. R. Co., 207 Ala. 253, 92 So. 797; Young Co. v. Payne, 127 Miss. 48, 89 So. 782; Bonfils v. Public Utilities Comm., 67 Colo. 563, 189 P. 775; Northern Pacific Ry. Co. v. Dept. of Pub. Works, 136 Wash. 389, 240 P. 362; Texas & Pac. Ry. Co. v. R. R. Comm., 137

La. 1059, 69 So. 837. To the same effect is the decision of the Railroad Commission of California, 2 Cal. R. R. Comm. R. 626. A similar decision was rendered September 16, 1930, by the United States District Court for the Southern District of Mississippi in Eagle Cotton Oil Co. v. So. Ry. Co., 46 F.(2d) 1006, wherein the order of the Interstate Commerce Commission in a case of the same title reported in 140 I. C. C. 131, granting reparations for excessive rates that had been fixed by the Commission, was held void. The appellee cites the decision of the Supreme Court in U. S. v. M. & M. Traffic Ass'n, 242 U. S. 178, 37 S. Ct. 24, 61 L. Ed. 233, as decisive of the question as to the power of the Commission to make reparations on the basis that Commission-made rates were unreasonable. This decision, as we understand it, merely holds that a shipper who is not a party to a proceeding attacking a rate as unreasonable cannot properly ask for a rehearing of its decision, but should file a new application attacking the rate, as permitted by section 13 of the Interstate Commerce Act (49 USCA § 13). On such application he would be entitled to a hearing notwithstanding the previous determination of the Commission in the other case. This decision does not deal with the question of reparations. Our attention is also directed to a decision of the United States District Court (in a three-judge case), McLean Lbr. Co. v. U. S., 237 F. 460, 466, where that court held that a shipper could invoke the aid of a court to review the action of the Commission on the ground that the rate is unreasonably high. It is sufficient to say of this case that the question involved was not one of reparations, but of the power of the court to review the order of the Commission fixing a new rate, upon the ground that its action was not in pursuance of its authority and that the rate fixed was unreasonably high. The court held that it could entertain a bill to inquire into the matter at the instance of a party to the proceedings before the Interstate Commerce Commission, but it also held that the finding of the Commission as to the reasonableness of the rate it established was conclusive where supported by substantial evidence, 237 F. page 470. This decision has no bearing upon the question involved here as to the power of the Commission to award the reparations in conflict with its own previous findings as to the reasonableness of a rate.

The decision of the Supreme Court in Baltimore & O. R. Co. v. U. S., 279 U. S. 781, 49 S. Ct. 492, 73 L. Ed. 954, is cited as sustaining the power of the Commission to make an

award in opposition to its finding in the "first case" and to make reparations accordingly. That case merely decided that when the order of the Commission was set aside by the court as illegal the court could order a restoration of funds paid under the erroneous order as a part of the relief granted the parties attacking the validity of the order. This decision does not support the conclusion that a court could set aside a previous judgment, or decree, in a subsequent suit brought for that purpose, merely because in the former suit an erroneous view of the evidence had resulted in the judgment, or decree, nor is it authority for the proposition that a court can set aside a law or legislative act because the legislators were induced to pass the legislation by false or erroneous or insufficient evidence. Such power does not exist. There are statements in the opinion of the Supreme Court in Reagan v. Farmers' L. & T. Co., 154 U. S. 362, 367, 14 S. Ct. 1047, 1054, 38 L. Ed. 1014, that militate against the views herein expressed. We quote from that opinion the paragraph relied upon by amici curiae to sustain the power of the Commission to award reparations against past collections of Commission-made rates.

"It is doubtless true, as a general proposition, that the formation of a tariff of charges for the transportation by a common carrier of persons or property is a legislative or administrative, rather than a judicial, function. Yet it has always been recognized that, if a carrier attempted to charge a shipper an unreasonable sum, the courts had jurisdiction to inquire into that matter, and to award to the shipper any amount exacted from him in excess of a reasonable rate, and also, in a reverse case, to render judgment in favor of the carrier for the amount found to be a reasonable charge. *The province of the courts is not changed, nor the limit of judicial inquiry altered, because the legislature, instead of the carrier, prescribes the rates.* The courts are not authorized to revise or change the body of rates imposed by a legislature or a commission. They do not determine whether one rate is preferable to another, or what, under all circumstances, would be fair and reasonable, as between the carriers and the shippers. They do not engage in any mere administrative work. But still there can be no doubt of their power and duty to inquire whether a body of rates prescribed by a legislature or a commission is unjust and unreasonable, and such as to work a practical destruction to rights of property, and, if found so to be, to restrain its operation. In Chicago, B. & Q.

R. Co. v. Iowa, 94 U. S. 155, 24 L. Ed. 94, and Peik v. Chicago & N. W. R. Co., 94 U. S. 164, 24 L. Ed. 97, the question of legislative control over railroads was presented; and it was held that the fixing of rates was not a matter within the absolute discretion of the carriers, but was subject to legislative control." (Italics ours.)

It is therefore argued that as the courts could formerly award reparations even against legislative rates, the Commission, acting as a quasi judicial body, can now exercise that function. In considering this decision it should be observed that the paragraph relied upon, so far as it refers to the power of the court to review a legislative rate because such rate is excessive, was not involved in the case. The question for decision was the power of the court to relieve a carrier from rates so low as to be confiscatory (Id., 154 U. S. page 399, 14 S. Ct. 1047, 38 L. Ed. 1014), a power now universally conceded. This dictum in Reagan v. Farmers' L. & T. Co., supra, is inconsistent with the theory of reparations for excessive or discriminatory rates stated in Mitchell Coal & Coke Co. v. Penna. R. Co., 230 U. S. 247, 259, 33 S. Ct. 916, 921, 57 L. Ed. 1472, supra, as follows: "Under the statute the carrier has the primary right to fix rates, and so long as they are acquiesced in by the Commission, the carrier and shippers are alike bound to treat them as lawful. After the rate had been abandoned, the carrier is still obliged to treat it as having been lawful, and cannot refund what has been collected under it until the Commission determines that what was apparently reasonable had in fact been unreasonable. But such a determination cannot be made by the courts, for they would not only have first to exercise an administrative function and make a rate by which to measure the reasonableness of the charge collected, but would have to go further and treat as unreasonable a rate, past or present, which the statute had declared should be deemed lawful until it had been held to be otherwise by the Commission."

This case dealt with the power of the courts under the Interstate Commerce Act (24 Stat. 382), the predecessor of the act involved here. In that case it was also said that: "The courts have not been given jurisdiction to fix rates or practices in direct proceedings, nor can they do so collaterally during the progress of a lawsuit when the action is based on the claim that unreasonable allowances have been paid." See, also, Skinner & Eddy Corp. v. U. S., 249 U. S. 557, 562, 39 S. Ct. 375, 63 L. Ed. 772.

The parties here concede that the Commission alone must declare the unreasonableness of the past rate and ascertain the reasonable rate that should be charged as a basis for reparations. There is no helpful analogy between the common law power of the courts in giving relief against unreasonable rates and the statutory power of the Commission to make reparations, for in the latter case jurisdiction is statutory and the new rate is one that upon ascertainment must be applied in all subsequent applications for reparations covering that period.

It is contended by amici curiæ that the rates established by the Commission June 22, 1921, in the first case, had been set aside and nullified by the act of the carrier in establishing a lower rate and by the proceedings of the Interstate Commerce Commission entitled Reduced Rates 1922, 68 I. C. C. 676, wherein the Commission advised certain blanket reduction of rates by percentages, which recommendation was acted upon by the carriers by making a reduction from 96 to 86.5 cents per 100 from California points to Phœnix. We cannot concur in this conclusion. It is based upon the claim, or perhaps it should be only considered a suggestion, to meet the appellants' contention, that the maximum rate fixed by the Commission was the exact and only measure of reasonableness and that therefore a lower rate is necessarily a departure from reasonableness. This suggestion is based upon the assumption that the exact amount of a just and reasonable rate is capable of exact scientific ascertainment, as is the time of an eclipse, or the velocity of light, or as the weight of a cubic foot of water, whereas the extent to which freight rates are reasonable or unreasonable is a matter of judgment to be exercised by men and upon which they will and do differ. The ascertainment of a maximum rate is in effect a decision that any rate below that maximum is reasonable as to the shipper, and that the carrier below that maximum can be trusted to fix a rate that is not too low to protect itself. There was no change in the subsequent action of the Commission or of the carrier which affected the maximum; and no change in the maximum by the Commission, because the voluntary act of the carrier in reducing its rate to 86.5 made an order unnecessary. The nature of this blanket order of the Commission was considered by the Supreme Court in Brimstone R. & Canal Co. v. U. S., 276 U. S. 104, 48 S. Ct. 282, 72 L. Ed. 487.

Judgments reversed.