## EAGLE COTTON OIL CO. v. SOUTHERN RY. CO. et al.

### No. 6126.

Circuit Court of Appeals, Fifth Circuit.
July 21, 1931.

Rehearing Denied Sept. 4, 1931.

E. B. Williams, of Meridian, Miss., Luther M. Walter, John S. Burchmore, and Nuel D. Belnap, all of Chicago, Ill., and Allan P. Matthew, of San Francisco, Cal. (Felix T. Smith and Samuel L. Wright, both of San Francisco, Cal., Paul M. Gregg and Jerry H. Powell, both of Los Angeles, Cal., F. F. Thomas, Jr., John O. Moran, Pillsbury, Madison & Sutro, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., on the brief), for appellant.

Joseph P. Cook, of Washington, D. C., A. S. Bozeman, of Meridian, Miss., W. N. McGehee, of Washington, D. C., W. E. Baskin, of Meridian, Miss., James E. Lyons and Burton Mason, both of San Francisco, Cal., and Harry McCall, of New Orleans, La. (Baskin, Wilbourn & Miller and Bozeman & Cameron, all of Meridian, Miss., on the brief), for appellees.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

BRYAN, Circuit Judge.

This is an action by appellant on an order of the Interstate Commerce Commission awarding reparation on account of excessive freight rates collected by the appellee railroad carriers for the transportation of coal from mines in Alabama to Meridian, Miss. The published rate of $2.03 per ton was held by the Commission, in a proceeding begun before it by appellant in 1925, to have been excessive to the extent that it exceeded $1.85 per ton from certain mines and $1.95 from other mines, and these lower rates were prescribed as reasonable for the future. Appellant was awarded reparation measured by the difference between the lower and higher rates on shipments received within two years prior to the filing of its claim up to March 8, 1928, the date of the order. Eagle Cotton Oil Co. v. Southern Railway Co., 140 I. C. C. 131. No attack is made upon the reasonableness of the new rates as applied to the period covered by the reparation award. But the District Judge, before whom the case was tried without a jury pursuant to written stipulation, held that the Commission was without power to award reparation on account of shipments made prior to the date of the order finding the $2.03 rate to be unreasonable, because that rate had been fixed and prescribed by it, and, this being so, must be conclusively presumed to have been a reasonable and lawful one. He therefore entered judgment denying appellant's claim for damages. 46 F.(2d) 1006.

On July 22, 1915, the Commission, in passing upon a proposed increase of rates on coal, authorized a rate not exceeding $1.20 per ton from the Alabama mines to Meridian. Coal & Coke Rates in the Southeast, 35 I. C. C. 187, 202. An increase of 10 cents per ton, effective July 1, 1917, was authorized in The Fifteen Per Cent. Case, 45 I. C. C. 303. On June 25, 1918, another general increase, but without reference to any particular rate, was made by the Director General, and thereupon appellees published a rate on coal of $1.80 per ton; but this was done without the order or approval of the Commission. On August 26, 1920, the Commission authorized a general increase of 25 per cent. of freight rates, but without approval of any particular rate, Ex parte 74, 58 I. C. C. 220; and appellees raised the rate here involved to $2.25 per ton. On July 1, 1922, the Commission recommended a general reduction of 10 per cent. also without approval of any particular rate, Reduced Rates, 1922, 68 I. C. C. 676; and appellees thereupon reduced the rate in question to $2.03 per ton, which they continued to collect up to March 9, 1928, when the $1.85 and $1.95 rates were established by the Commission as maximum rates from the Alabama mines to Meridian. Eagle Cotton Oil Co. v. Southern Railway Co. et al., supra.

These several decisions of the Commission and the order of the Director General are relied on to establish the conclusion that the $2.03 rate was fixed and prescribed by the Commission as a reasonable and lawful maximum rate. The rate of $1.20 per ton on shipments of coal from the Alabama mines to Meridian was the only one that was definitely and specifically authorized by order of the Commission. That rate became effective on October 1, 1915, and, as the law then was, expired by limitation at the end of two years. Act Feb. 4, 1887, § 15, as amended by Act June 29, 1906, § 4, Act June 18, 1910, § 12, 36 Stat. 551. It was not until after the passage of the Transportation Act

of 1920 that a rate established by the Commission could continue in force without time limit until its further order. 49 USCA § 15 (2). The Commission's order in the Fifteen Per Cent. Case, supra, effective July 1, 1917, authorized a general increase of 10 cents per ton throughout the country, but did not purport to grant permission to advance any particular rate. The order of the Director General in 1918 likewise was dealing with all rates, and had no particular reference to rates on coal; besides it was not the equivalent of an order of the Commission, and the Commission by section 10 of the Federal Control Act (40 Stat. 456) was given the power to suspend or set it aside. But with the aid of the Director General's order the rate did not exceed $1.80 per ton, which was less than the rates approved by the Commission upon the basis of which it awarded reparation to appellant. The carriers rely on Ex parte 74, supra, which authorized an increase of 25 per cent. in the general level of all rates, but without approval of any particular rate, as their authority for increasing the rate on coal shipped from the Alabama mines to Meridian to $2.25 per ton; and then claim that the rate became $2.03 per ton in 1922 as a result of the Commission's decision in Reduced Rates, 1922, supra. The most that can reasonably be contended for in support of the proposition adopted by the trial court that the $2.03 rate was Commission-made is that it resulted from adding to and building up the rate of $1.20 that was authorized by the Commission. Aside from the fact that the Commission's order entered in 1915, establishing the $1.20 rate, had expired by limitation long prior to the decisions in Ex parte 74 and in Reduced Rates, 1922, the law, as we understand it, is that orders of the Commission authorizing a general upward revision or adjustment of rates are not to be construed as giving approval of or prescribing particular rates. In Brimstone R. & Canal Co. v. United States, 276 U. S. 104, at page 122, 48 S. Ct. 282, 287, 72 L. Ed. 487, the Supreme Court said: "The general findings and permission of Ex parte 74 and Matter of Reduced Rates did not approve or fix any particular rate. * * * In them the Commission was dealing with the whole body of rates throughout the country—was looking at the general level of all rates—and the propriety of the rates to which the Brimstone Company was party was not the subject of particular investigation or consideration." It is true that case was dealing with a division of rates, but the principle involved is the same here as it was

there. The Supreme Court in that case cited with approval, among other decisions of the Commission, Steel & Tube Co. v. Director General, 61 I. C. C. 526, in which the Commission said that its "sanction of a general adjustment does not carry with it the approval of any particular rate." We are of opinion, therefore, that the trial court erred in holding that the $2.03 rate collected from appellant by appellees had been fixed and prescribed by the Commission, and in entering judgment rejecting appellant's claim for reparation. Having reached this conclusion, it is not necessary in this case to decide, and we do not decide, whether or not the power of the Commission to award reparation extends to rates of its own making. The decision of the Circuit Court of Appeals for the Ninth Circuit in Atchison, Topeka & Santa Fe R. Co. et al. v. Arizona Grocery Co., 49 F.(2d) 563, to the effect that the Commission was without jurisdiction to award reparation, proceeded on the theory that the rates there involved were Commission-made. The rate here involved in our opinion was made by the carriers, and if it was, of course, the Commission, upon a valid finding that it was excessive, had the power to award reparation. 49 USCA § 9.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

HUTCHESON, Circuit Judge (concurring).

I concur in the judgment of reversal. I think it plain that the rate made the subject of the reparation order was not one which had been specifically promulgated by the Commission. I think it equally plain that, speaking generally, the rate had received the Commission's approval and sanction.

I understand appellee to contend that in either event reparation could not have been ordered.

In my opinion neither specific approval by the Commission of a general schedule of rates, nor the specific promulgation of a particular rate, prevents the Commission from granting reparation as to that rate, if, upon complaint, it is advised that reparation should be made.

I place my concurrence on the broad ground, therefore, that it is immaterial whether the rate made the subject of the reparation order was, as the trial court held, Commission-made, or as the Court of Appeals holds, carrier-made. If a shipper has been injured by it, the Commission, and the Commission alone, may order reparation.

By the Transportation Act Congress has placed squarely upon the carriers the burden of establishing and maintaining just and reasonable rates, has made the carriers responsible in damages to any person injured by their failure to do so, and has directed the Commission to hear the shipper's complaint and if well founded, to award damages thereon.

By a long line of decisions built upon Texas & P. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 S. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075, the character of the Interstate Commerce Commission, its functions as a "tribunal informed by experience" to decide rate questions between carrier and shipper, the limits, the extent of its powers, the sphere within which and the method by which it may and must operate, have been carefully worked out and set down.

In addition, the Interstate Commerce Commission has through a long course of practice, and in a series of decisions of its own, built up and established for itself with the sanction and approval of the courts, a character of flexibility in the matter of the approach to, the consideration and determination of, rates and practices, and the results flowing therefrom in which the principle of res judicata or estoppel by decision has had and can have no just place.

It must of course be conceded that Congress could have by enactment at any time changed this settled character of the Commission and converted it into a body not supervisory and regulatory of carrier rates as it now is, but one which like the state commissions shall in a rigid and final way, except for direct resort to the courts, fix and prescribe rates. I think it perfectly plain that it has never done so.

In view of the structure and history of the act, the long-continued operations under it, the uniform current of opinion in the Commission and in the courts as to the dual function which permits the Commission prospectively to control the course of rates while preserving its power to retrospectively correct them and to award damages for injustices and injuries which have flowed from their establishment; in view of the fact that though the act now invoked to deprive the Commission of this power of re-examination has long been in existence, this is the first case in which such a holding has been sought —I think it plain that those who would maintain that Congress intended a different character for the Commission should be prepared to point to some clear enactment carrying that intention.

The invoked decisions of the state courts do not support the position of appellee here. They make strongly against it. They show that instead of the states having a rate-making system like the federal one, not rigid, but flexible, which permits its commissions from time to time and at any time to make orders changing rates, correcting abuses, reforming conditions, and awarding reparations, while in reliance upon the power of the Commission to retroactively repair injuries sustained as the result of their prospective orders, shippers may experimentally try out rates before resorting to the courts for relief, their systems are rigid and inflexible.

Under their systems their Commissions make their rates, and until set aside by the courts they are final and conclusive on carrier and shipper alike.

In the state of Texas, for example, the law requires, not the carriers, but the Commission to establish reasonable rates. It provides for a review by the courts of any rate, classification order, etc., adopted by the Commission whether at suit of carrier or shipper, in which the unreasonableness or injustice, not of the carrier's, but of the Commission's rates and practices may be brought into question. Unless upon a timely suit the rates are found unreasonable, they are by law made uncontrovertible as between carrier and shipper. Missouri-Kansas & T. R. Co. v. Railroad Commission (Tex. Civ. App.) 3 S.W.(2d) 469; Producers' Refining Co. v. Missouri, K. & T. R. Co. (Tex. Com. App.) 13 S.W.(2d) 679. While in Louisiana though the Commission has the right to award damages, the statute limits the damages which may be awarded to those resulting from "violation of rates, classifications, rules, regulations or orders adopted by the Commission." Texas & P. R. Co. v. Railroad Commission of Louisiana, 137 La. 1059, 69 So. 837, 839.

The courts in both of these states, in fact in all of the states, decisions from which are cited by appellee, give full recognition to the difference in the character and structure of the jurisdiction exercised by the Interstate Commerce Commission and that exercised by their own commissions.

In the opinion of the Circuit Court of Appeals in Atchison, Topeka & Santa Fe R. Co. v. Arizona Grocery Co., 49 F.(2d) 563, 568, holding that the Commission could not award reparation as to the rates specifically theretofore prescribed by it, it is said that under such circumstances "the shipper's remedy would be a seasonable application for a

change of rate before any serious damage had been suffered."

In my opinion this will not do. This is indeed the remedy, and the only remedy, the shipper has under the state system. This is, however, not the case under the federal system. Here the remedy is simpler, more efficacious, more reasonable, more just to shipper and carrier alike, and more consonant with the experimental character of rates and rate making. This system permits rates to be experimentally laid down and experimentally tried out. It preserves that flexibility of adaptation, the maintenance of which is necessary to the life and growth of our great and changing commerce, which would be lost and defeated if immediate resort to the courts were necessary, as in the state systems, to protect the rights of shippers against the burdens of an experimental rate.

This system, without fixation or rigidity, leaves it to the Commission to deal justly and fairly by carrier and shipper alike, authorizing it to use its powers to effect and maintain a reasonable rate structure through constant experiment and change, while preserving to it the right at any time upon complaint to relieve by specific reparation awards those who have suffered from temporary or particular inequalities and imperfections of this rate structure.

For the courts to now hold, in the absence of some specific and compelling congressional command, that such a system, so flexible, so reasonable, so adapted and adaptable to the commerce of this nation, so long an integral part of its operations under the sanction of the courts, is not in accordance with the law, would be in my opinion unwise, unreasonable, and wholly without legal warrant.