**TEXAS & P. RY. CO. et al. v. LOUISIANA OIL REFINING CORPORATION et al.***

**No. 7412.**

Circuit Court of Appeals, Fifth Circuit.

April 3, 1935.

Robert Wilkins Thompson, of Dallas, Tex., A. B. Freyer, C. Huffman Lewis, and Edward S. Klein, all of Shreveport, La., and W. B. Spencer, Jr., of New Orleans, La., for appellants.

H. C. Walker, Jr., of Shreveport, La., for appellees.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

This is a suit on a reparation award on account of shipments of refined petroleum products moving from Shreveport, La., to points in Texas, from July 14, 1928, to De-

*Writ of certiorari denied 55 S. Ct. 926, 79 L. Ed.

cember 15, 1931. The award, entered August 6, 1932, was as to commodity tariffs, the carriers had filed, effective July 1, 1922, and had kept in force until December 15, 1931, when they were found unreasonable by the commission.

Tried below on agreed facts stipulated with commendable brevity and simplicity, the result was to sustain the award. The carriers have appealed. The award was resisted below, it is resisted here, on the ground that it was made as to rates reasonable as matter of law, that is, lawful, because, as the carriers claim, they had been legislatively established by the commission. The shippers deny that this is so. They insist that the rates were carrier made.

If whether a rate is carrier or commission made were a simple question of fact, or a settled one in law, the stipulation would easily and simply answer it, for it states the facts as to the institution and maintenance of the rates briefly, directly, and clearly. That it is not so simple appellants' 63-page brief, and appellees' of 50 pages, the one maintaining that the stipulated facts show the rate to be commission made, the other that they show them carrier made, eloquently testify. The source of the difficulty is not far to seek. It is to be found in the fact that each claims to take its definition of commission prescribed or approved rates from the same source, the Arizona Grocery Co. Case.[1] The appellees defining a commission approved and prescribed rate as a specific rate prescribed for the future, upon complaint and after hearing, claim to have made it up literally from the opinion, making use of its very language. "When under this mandate the Commission declares a specific rate to be the reasonable and lawful rate for the future, it speaks as the Legislature, and its pronouncement has the force of a statute."

284 U. S. 386, 52 S. Ct. 185. "Specific rates prescribed for the future take the place of the legal tariff rates theretofore in force by the voluntary action of the carriers, and themselves become the legal rates. As to such rates, there is therefore no difference between the legal or published tariff rate and the lawful rate." 284 U. S. 387, 52 S. Ct. 185. "The action of the Commission in fixing such rates for the future is subject to the same tests as to its validity as would be an act of Congress intended to accomplish the same purpose." 284 U. S. 388, 52 S. Ct. 186. " * * * The new policy declared by the Congress, which, in effect, vests in the Commission the power to legislate in specific cases as to the future conduct of the carrier." 284 U. S. 390, 52 S. Ct. 186. Appellees say, too, that our Eagle Cotton Oil Co. Case, 51 F.(2d) 443, 444, supports and is supported by the definition they advance. Appellants say that appellees in their attempt to define a commission-made rate in the terms used in the Arizona Grocery Co. Case, as a specific rate, a rate made in a specific case, have mistaken an instance coming under, for the rule itself. They say that they have thus denied to the decision its natural and legitimate effect of defining commission prescribed or approved rates, as rates promulgated by carriers, in response to either a specific finding as to a specific rate, as the Arizona Grocery Co. Case was, or in response to a general finding as to rates in general, which rates are within the maximum limits, found by the commission not to be unreasonable. They rely for this view as to the generality of the decision on the last sentence in the opinion.[2] They rely, too, upon what they claim is its general effect and particularly upon the general declarations of the opinion likening the action of the commission to that of the Congress.[3] They argue, too, that the later de-

[1] Arizona Grocery Co. v. Atchison Ry., 284 U. S. 370, 52 S. Ct. 183, 185, 76 L. Ed. 348.

[2] "Where the Commission has upon complaint, and after hearing, declared what is the maximum reasonable rate to be charged by a carrier, it may not at a later time, and upon the same or additional evidence as to the fact situation existing when its previous order was promulgated, by declaring its own finding as to reasonableness erroneous, subject a carrier which conformed thereto to the payment of reparation measured by what the Commission now holds it should have decided in the earlier proceeding to be a reasonable rate." 284 U. S. 390, 52 S. Ct. 186.

[3] "If by act of Congress maximum rates were declared lawful for certain classes of service, neither carrier nor shipper could thereafter draw into question in the courts the conduct of the other if it conformed to the legislative mandate. By the amendatory legislation, Congress has delegated to the Commission as its administrative arm its undoubted power to declare, within constitutional limits, what are lawful rates for the service to be performed by the carriers. The action of the Commission in fixing such rates for the future is subject to the same tests as to its validity as would be an act of Congress intended to accomplish the same purpose." 284 U. S. 388, 52 S. Ct. 185.

cision from the Ninth Circuit, Arizona Grocery Co. v. Southern Pacific Co., 68 F.(2d) 601, supports their view of the meaning and effect of the Supreme Court decision.

Guided by the rule that that which is decided is only that which the facts of the case bring before the court for decision,[4] and that everything in the opinion is to be considered and weighed in the light of what is decided, we turn to the facts, as the opinion of the Supreme Court states them, to determine which definition is the right one. These are to be found stated at pages 381, 382 and 387 of 284 U. S., at pages 183 and 185 of 52 S. Ct.[5] So turning, we are not left in any doubt that appellees' definition is the right one. It remains only to apply that definition to the stipulated facts. These, as they bear on the question of commission or carrier made rates, are: In its docket No. 8418, by general order dated January 22, 1918, effective May 1, 1918, the Interstate Commerce Commission [6] prescribed rates for refined petroleum products from Shreveport to Texas points, which should not exceed the class rates therein prescribed as reasonable maxima for the classes to which the respective commodities belonged, for like distances, and which on refined petroleum products should not exceed 28 cents per hundred pounds, as maxima for single line hauls in excess of 120 miles, and for joint line hauls in excess of 90 miles. The Director General, in the period of federal control, issued a general order, dated May 27, 1918, putting this rate into effect. On May 25, 1918, effective June 25, 1918, he issued General Order No. 28, ordering a general increase in rates of 25 per cent., but without specific reference to refined petroleum products. The commission, on May 27, 1918, modified its January 22d order, to the extent of permitting the publication and maintenance of rates not in excess of those prescribed in General Order No. 28. The Director General, by order dated August 10, 1918, in lieu of the prior general 25 per cent. increase under General Order 28, increased the rates on refined petroleum products to the extent of 4.5 cents per hundred pounds. On April 25, 1920, the commission entered a further order in its Docket No. 8418, further modifying its prior order of January 22d as modified by its General Order of

---

4 "The ratio decidendi, the reason for the decision, the principle of the case, is not found in the reasons or the rule of law set forth in the opinion, nor by a consideration of all of the ascertainable facts of the case and the judge's decision. But the principle of the case is found by taking account of the facts treated by the judge as material and his decision upon them, taking also into account those facts treated by him as immaterial." Determining the Ratio Decidendi of a Case. Essays in Jurisprudence and the Common Law. Goodhart, University Press, 1930.

5 "The respondent carriers maintained a rate of $1.045 per hundred pounds for shipment of sugar from California points to Phoenix, Ariz. On complaint of petitioner and others, the Commission, after hearing on June 22, 1921, found that the rate attacked had been, then was, and for the future would be, unreasonable to the extent that it exceeded 96.5 cents [62 I.C.C. 412], and ordered the establishment of a rate not exceeding that figure. September 17, 1921, the carriers promulgated a rate of 96 cents, which they later voluntarily reduced to 86.5 cents. November 3, 1922, certain of the complainants in the earlier proceeding, other than petitioner, filed a new petition attacking the current rate. While this case was pending the carriers, on January 10, 1924, again made a voluntary reduction to 84 cents. February 25, 1925, the Commis-

sion filed a report prescribing for the future a maximum reasonable rate of 71 cents, to that extent modifying its earlier order. [95 I.C.C. 244] * * * In a later proceeding, with which petitioner's and other claims for reparation were consolidated, the Commission found that the rates to Phoenix from and after July 1, 1922, had been unreasonable to the extent they had exceeded 73 cents from Northern California and 71 cents from Southern California. [140 I.C.C. 171] * * * The date of the first shipment made by petitioner on which reparation was awarded was February 21, 1923, and of the last February 5, 1925, so that all were made between the effective dates of the first and second orders above mentioned." 284 U. S. 381, 382, 52 S. Ct. 183.

"The report and order of 1921 involved in the present case declared in terms that 96.5 cents was, and for the future would be, a reasonable rate. There can be no question that, when the carriers, pursuant to that finding, published a rate of 96 cents, the legal rate thus established, to which they and the shipper were bound to conform, became by virtue of the Commission's order also a lawful—that is, a reasonable—rate." Arizona Grocery Co. v. Atchison, Topeka & S. F. Ry., supra, 284 U. S. 387, 52 S. Ct. 183, 185.

6 Railroad Commission of Louisiana v. Arkansas Harbor Terminal R. Co., 48 I.C.C. 312.

May 27th, so as to continue it in effect until further orders of the commission. On July 29, 1920, in its Docket Ex Parte 74, entitled "Increased Rates, 1920" [7] the Commission authorized a general rate increase of 35 per cent. applicable, but not specific as to refined petroleum products. These increased rates were published and made effective by the carriers as of August 26, 1920. On May 16, 1922, the commission, Docket No. 13,293, entitled "Reduced Rates 1922," [8] made the finding and determination that on and after July 1, 1922, the then existing freight rates and charges would be unjust and unreasonable to the extent that they should exceed by more than 21.5 per cent. the rates in the Western group, in which the territory herein involved is included, that were in effect on August 25, 1920, immediately before the 35 per cent. increase previously authorized became effective. No order was entered by the commission, but the reduction so directed was made effective by the carriers as of July 1, 1922. Effective December 15, 1931, by its order entered in Docket No. 17,000 Part 4–A,[9] the commission reduced the rates on refined petroleum products and on August 6, 1932, entered the reparation order. From May 1, 1918 to July 14, 1928, the established and published rates on refined petroleum products from Shreveport to Texas destinations at no time exceeded and for the longer distances were substantially less than the contemporaneous fifth class rates. From July 14, 1928, to December 15, 1931, these commodity petroleum rates materially exceeded the contemporaneous fifth class rates as prescribed by commission on July 7, 1928, in Docket No. 13535.[10] The rates on refined petroleum products were not, however, under review in docket No. 13,-535, but were specifically excluded therefrom. It was for the period after July 14, 1928, the going into effect of the reduced fifth class rates, that the reparation was awarded.

Applying the definition to these facts, it is seen that here is no commission-made rate, no "specific rate upon complaint and after hearing," prescribed "for the future to take the place of the legal tariff rates theretofore in force by the voluntary actions of the carriers." Here are carrier-made rates, made it is true, under general sanctions, the general sanction of the commission as the result of blanket revisions authorizing first, a general increase;[11] later a general reduction.[12]

---

[7] 58 I.C.C. 220.

[8] 68 I.C.C. 676.

[9] 171 I.C.C. 437.

[10] 123 I.C.C. 203; 139 I.C.C. 535.

[11] (a) In time of war under General Orders of the Director General, approved by the equally General Orders of the Commission. (b) In 1920, under General Orders of the Commission, entered in "Increased Rates 1920," 58 I.C.C. 220, in a time of recognized inflation and of great fluidity and change. The commission, in making the order, said: "Most of the facts with which we are dealing are constantly changing. It is impossible to forecast with any degree of certainty what the volume of traffic will be. The general price level is changing from month to month and from day to day. The rates to be established on the basis hereinbefore approved, must necessarily be subject to such readjustments as the facts may warrant. It is conceded by the carriers that much readjustment will be necessary." Commissioner Eastman, in a concurring opinion, said: "The present proceeding has nothing of finality about it, and in many respects is similar to a suspension case. A matter left by the act to the discretion of the Commission."

[12] In 1922, in a time of great deflation, in "Reduced Rates 1922" Docket 13293, 68 I.C.C. 678, a general decrease amounting to around 10 per cent. was ordered. The commission stated the question thus:

"The important questions for determination are whether present rates, fares and charges, in the aggregate, as a whole or in the several rate groups defined in Increased Rates, 1920, or upon specified commodities or descriptions of traffic, are or will be reasonable under section 1 or other provisions of the act; whether such rates, fares, and charges are those which will most nearly produce a fair return as provided in Sec. 15a, and what the fair return shall be on and after March 1, 1922." In the course of the discussion of this case it was brought out and emphasized that conditions just the opposite of those which caused the grant of increased rates were now in operation.

"In 1920 we authorized a large increase in freight rates, designed to produce the necessary revenues under conditions then prevailing. There was then little doubt of the ability of industry to bear the charges. The situation has since changed. The country has been passing through a period of abundant supply and slack demand in which prices at the source have fallen sharply. Shippers almost unanimously contend, and many representatives of the carriers agree, that "freight rates are too high and must come down." After considering all the facts of rec-

All of these orders, as the reports show, were made under the influence of the war, and of the inflation and deflation which were its aftermath. The controlling considerations in these proceedings were the general ones of obtaining revenue for the carriers, while meeting the need of and stimulating shipping and business. The reasonableness of particular or specific rates was neither determined nor considered; the orders were blanket orders revising all rates upward at one time, downward at another. If these proceedings are construed to be specific fixings of specific rates, they have resulted in making substantially all rates commission made, for general in their terms, they gave sanctions for and applied sanctions to, every tariff schedule the country over. That it was not meant by the Arizona Grocery Company Case to hold rates made as these were commission made, is made certain, we think, by this statement in the opinion, "it is also to be observed that, so long as the act continues in its present form, the great mass of rates will be carrier-made rates." 284 U. S. 390, 52 S. Ct. 183, 186. This could not be so if the general sanctions of the commission's orders in the "Increased Rates 1920" and "Reduced Rates, 1922" proceedings, amounted to commission prescribing or approval of all tariffs promulgated pursuant thereto. Our case of Eagle Cotton Oil Co. was as to the question involved, the same case as this. The rate for which reparation was awarded there was a rate made up, as these were, under the general sanctions of these war and after war general orders. The view we took there, and take here, that rates made as these were are not commission-made rates is in accord, we think, with the Arizona Grocery Case, and in accord with the interpretation the Supreme Court has given that case in Great Northern R. R. v. Sunburst, 287 U. S. 358, 53 S. Ct. 145, 77 L. Ed. 360, 85 A. L. R. 254. It is in accord, too, with the Brimstone Case, 276 U. S. 104, 48 S. Ct. 282, 72 L. Ed. 487, and with United States v. Louisiana, 290 U. S. 70, 54 S. Ct. 28, 78 L. Ed. 181. The view we take accords fully with the view emphasized in the Arizona Grocery Case, that the system now administered by the commission is dual in nature. This view preserves the flexibility of the system as it was originally designed. It saves the federal regulatory system from the rigid mold in which most state systems are cast. It keeps faith with carrier and shipper alike. It permits commission decisions to be broadly made, as sanctioned in the Louisiana Case, supra, without subjecting shippers to the disadvantages of being confronted with the claim that experimental rates, laid down under such general sanctions, are final rates, as against claims for reparation. It affords carrier and shipper alike, however, an opportunity, if either desires it, to apply to the commission to have specific rates authorized under specific orders.

■ The District Judge thought the rates carrier made. He thought that the fact that the 1918 order fixing the basic 28-cent rate for petroleum products and providing that these rates should not exceed the contemporaneous fifth class rates, gave emphasis to this view. He thought, too, that the carriers having continued to maintain the commodity rates in force during the period for which reparation was awarded, though the commission had, upon complaint and hearing, reduced fifth class rates below them, could not complain of the reparation order as unjust, or as one declaring the commission's earlier finding as to reasonableness erroneous, one, in short, declaring that the commission should have decided in 1922 that the rate they found unreasonable in 1928, was unreasonable then.

We agree with the District Judge that the carriers may not justly complain of the reparation award. While it is true that the proceedings which resulted in 1928 in reducing the fifth class rates did exclude petroleum and petroleum products, there were pending before the commission at the same time, and they had been pending since 1927 (171 I. C. C. 457) the complaints against these very petroleum rates, which finally resulted in 1931 in the reparation award.

We think the judgment was right. It is affirmed.

---

ord, including the necessity of reasonable expenditure for additions and betterments, the commission found and determined the fair return to the carriers, under section 15a, to be 5.75 per cent. That the existing freight rates and charges which were increased by authority of "Increased Rates 1920" will be on and after July 1, 1922, unjust and unreasonable to the extent that they included more than 21.5 per cent. instead of the 35 per cent. so authorized.