**CITY OF DANVILLE et al. v. CHESA-PEAKE & O. RY. CO. et al.**

**DANVILLE HOTEL CO., Inc., et al. v. SAME.**

Nos. 3698, 3699.

District Court, W. D. Virginia, at Danville.
Aug. 10, 1940.

Harry C. Ames, of Washington, D. C., and Frank Talbott, Jr., and John W. Carter, both of Danville, Va., for plaintiffs.

Charles Clark, of Washington, D. C., Grasty Crews, of Danville, Va., W. H. T. Loyall, of Norfolk, Va., H. T. Hall, of Roanoke, Va., M. Carter Hall and Elmer Beach, both of Richmond, Va., Lucian H. Cocke, Jr., of Roanoke, Va., and John C. Donnally, D. Lynch Younger, and W. N. McGehee, all of Washington, D. C., for defendants.

PAUL, District Judge.

By agreement these two cases, involving the same questions, were heard together without the intervention of a jury. They are suits brought under authority of Section 16 of what is known as the Interstate Commerce Act, 49 U.S.C.A. § 16, to

recover damages based on orders of the Interstate Commerce Commission awarding reparation for freight charges on coal shipments which the Commission held were unreasonable.

The petitioners in case No. 3698 filed complaint before the Interstate Commerce Commission in May, 1931, assailing as unreasonable rates on coal transported from mines in Virginia and West Virginia over lines of defendants to Danville, Virginia. The complaints in case No. 3699 were filed before the Commission in March and June of 1933 attacking rates from the same mines to Danville and to Gretna, Virginia. The first complaint was docketed by the Commission as No. 24482 and a hearing before an examiner was had in November, 1931, at which considerable evidence was introduced and upon this the Commission, on January 30, 1933, made a report and finding to the effect that the assailed rates were unreasonable, that the complainants had made the shipments and paid the charges described in their complaint, and had been damaged in the amount of the difference between the charges paid and those found to be reasonable; and that they were entitled to reparation with interest.

Being unable to ascertain the exact amount of reparation due, the Commission directed that complainant comply with Rule V of the Rules of Practice, which provides for the filing of a statement showing details of the shipments on which reparation is claimed, this including the date of the shipment, its place of origin, the weight of the shipment, the charges paid and date of payment, and other details designed to enable an accurate statement of the amount of reparation to be arrived at. Such a statement was filed by the complainants, but the carriers declined to certify or agree to its correctness, and a further hearing was had before an examiner on October 6, 1933, for the purpose of receiving proof of the amounts claimed and to determine the amount of reparation due. During the pendency of the proceedings on this complaint, No. 24482, and probably as a result of the Commission's finding of January 30, 1933, the other complaints were filed in March and June, 1933, as heretofore noted. These latter were docketed by the Commission as No. 25947 and No. 25947 (Sub-No. 1). Inasmuch as the reasonableness of the rates to Danville had been tried out in complaint No. 24482, the parties agreed that the evidence in No. 24482 should be considered as part of the record in the later complaints without the necessity of repetition. The hearing of October 6, 1933, to determine the amount of reparation involved all of the complaints.

Following this hearing, the examiner prepared reports recommending certain findings and to these exceptions were filed by various parties. On April 27, 1935, the Commission made its final report, in which it stated that all of the complaints here involved (as well as several others) presented similar issues and would be dealt with in one report. The report recited the prior proceedings in No. 24482, including the finding (January 30, 1933) that the rates there assailed were unreasonable. It further recited the agreement of the parties that the evidence in 24482 should be considered as part of the record in 25947 and 25947 (Sub-No. 1) and found the rates assailed in the latter complaints unreasonable. This report excluded certain claims of shippers because of lack of proof and approved others which had been questioned. It found that the complainants, who were listed by name, were entitled to reparation with interest in amounts specifically shown in an order accompanying the report. This final order, dated April 27, 1935, directed that payment of reparations to the parties and in the amounts named be made on or before July 27, 1935.

The defendant carriers failed to make payment within the time prescribed, and several months later these suits were instituted in this Court pursuant to the terms of the Interstate Commerce Act, § 16(2), 49 U.S.C.A. § 16(2), providing that when a carrier has failed to comply with an order of the Commission for the payment of money, the complainant for whose benefit the order was made may file his petition in the district court setting forth his claim for damages based on the order of the Commission.

To the petitions filed in this Court, the defendants filed a demurrer and pleas of non-assumpsit and not guilty. Amendment of the petitions was allowed to meet certain grounds of demurrer and the defendants filed grounds of defense under their pleas. As the pleadings were finally determined, the defenses, stated briefly and in substance, were:

(1) The order of the Commission does not contain and is not supported by es-

sential findings of fact necessary to support an award.

(2) The order is not supported by substantial evidence of record before the Commission.

(3) The finding of facts made by the Commission in its reports of January 30, 1933, and April 27, 1935, require a determination that the rates in question were not unreasonable.

(4) The evidence of record before the Commission requires a determination that the questioned rates were not unreasonable and that none of the complainants are entitled to reparation.

(5) That the Commission was without authority to condemn the rates as unreasonable in the past and to award reparation based thereon, for the reasons that: (a) The Commission had previously approved said rates as not unreasonable; (b) the Commission had previously approved as not unreasonable rates on coal similar to those assailed; (c) the rates assailed had long been maintained and under them a substantial traffic had moved without complaint as to reasonableness; (d) the rates assailed compare favorably with other rates contemporaneously maintained from the same general origin to the same general destination; (e) that the prior approval of the rates, their long maintenance and the movement of substantial traffic under them were facts upon which the carriers were entitled to rely in determining their reasonableness to the extent of not thereafter being called on to make reparation based on them.

(6) That the Commission exceeded its power, acted arbitrarily and denied the defendants due process of law in violation of the Fifth Amendment.

▮▮▮ In considering the issues raised by the above enumerated defenses, attention should be called to certain principles which seem settled by the long line of decisions involving actions brought under this statute. The action is not upon the award as such or to enforce compliance with the Commission's order. Meeker v. Lehigh Valley R. Co., 236 U.S. 412, 35 S. Ct. 328, 59 L.Ed. 644, Ann.Cas.1916B, 691; Lewis, etc., Co. v. Southern Pacific R. Co., 283 U.S. 654, 661, 51 S.Ct. 592, 75 L. Ed. 1333. The action is one for damages, which according to the terms of the statute (49 U.S.C.A. § 16(2), proceeds as all other suits for damages, subject to the

condition that upon the trial the findings and order of the Commission shall be prima facie evidence of the facts stated therein. It is also true that it is a condition precedent to bringing such an action for damages in court that there shall have been a prior finding by the Commission that the rate charged was unreasonable. Lewis, etc., Co. v. Southern Pacific R. Co., supra, and cases there cited. The plaintiffs could not have come into this Court as an original proposition asking this Court to determine that a rate charged was unreasonable and for a judgment for damages based on the excessive charge. It is well settled that the courts have no rate-making power. That power and duty has been vested in the Interstate Commerce Commission alone. Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 448, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann. Cas. 1075; Mitchell Coal & Coke Co. v. Pennsylvania R. R., 230 U.S. 247, 258, 33 S.Ct. 916, 57 L.Ed. 1472; Pennsylvania R. Co. v. International Coal Mining Co., 230 U.S. 184, 196, 33 S.Ct. 893, 57 L.Ed. 1446, Ann.Cas.1915A, 315. And when such cases come before the court, after findings of unreasonableness by the Commission, it is not the province of the court to substitute its judgment for that of the Commission where the latter has been based on substantial evidence taken in due course. The court will not weigh the evidence to determine whether in its judgment the rate was unreasonable. Chicago, R. I. & P. R. Co. v. United States, 274 U.S. 29, at page 33, 47 S.Ct. 486, 71 L.Ed. 911. To permit this would be to allow the courts to determine rates in each instance where they differed with the Commission as to the weight of the evidence adduced before the Commission; they would become the ultimate rate-making body to the practical disregard of the statute which vests that power in the Interstate Commerce Commission.

▮▮▮ Applying these principles, it would seem that while the plaintiff must, as in any other suit, prove that he has been damaged and the amount of his damage, this requirement is satisfied by introduction of the Commission's order determining the fact of damage and the amount thereof. The statute makes the findings and order of the Commission prima facie evidence of these facts and, in the absence of other evidence, this is sufficient to entitle the plaintiff to recover. It is well settled that the amount of damage, if any is recover-

able, is the difference between the amount actually paid in pursuance of the rate exacted and the amount which would have been paid on such rate as the Commission found to be reasonable. I understand that this is conceded to be the proper measure of damage in such cases and that there is no dispute here as to the verity of any shipments involved in plaintiff's claims or the charges paid thereon.

█ It should be borne in mind that it is not required that the findings of the Commission on which a suit of this nature may be based should include a review of the evidence or a statement of the evidential facts on which its conclusions were based. What is required is a finding of the ultimate facts which entitle a complainant to recover damages. See Meeker v. Lehigh Valley R. Co., 236 U. S. at page 427, 35 S.Ct. 328, 59 L.Ed. 644, Ann.Cas.1916B, 691; Mills v. Lehigh Valley R. Co., 238 U. S. 473, at pages 478 and 480, 35 S.Ct. 888, 891, 59 L.Ed. 1414. In the first of these cases, the Court indicates the facts which the Commission's report must necessarily show and in the second case cites its previous views on this subject and approves as sufficient a report which "shows the relation of the parties as shipper and carrier in interstate commerce; the general character of the traffic involved and the amount of the shipment with respect to which reparation was claimed; the determination that the rate exacted (which was specified) was unjust and unreasonable to the extent that it exceeded the established rate (also specified); and, further, the determination that the companies respectively should pay a stated amount 'as reparation for the collection of unreasonable charges' on the quantities mentioned." In both of these cases, it is made clear that the report need not set out the evidential facts on which it based the essential ultimate findings.

Bearing in mind the general principles before stated, we may now examine the defenses offered in this case, which have heretofore been set out in substance.

The first of these (numbered 1 in the enumeration hereinbefore) is to the effect that the Commission's order does not contain and is not supported by the essential findings of fact necessary to support an award of reparation. An examination of the order of April 27, 1935, directing the payment of reparations shows that it recites the making and filing of its reports of January 30, 1933, and April 21, 1933 (Complaint No. 24482), and its report of April 27, 1935 (complaints Nos. 25947 and 25947 (Sub-No. 1), and specifically provides that all of such reports are "hereby referred to and made a part hereof". Examination of the report of January 30, 1933, shows that, after setting forth the status of the various complainants and the carriers against whom complaint was made, it proceeds to a discussion of the nature of the complaints made, naming the rates assailed as unreasonable and the rates asked for by the complainants as being reasonable. There is considerable discussion in the way of comparison of other rates in the same or adjacent territory and references to other evidence in the record. The conclusions are embodied in the following:

"We find that the assailed rates from the Pocahontas-New River group were, are, and for the future will be, unreasonable to the extent that they exceeded, exceed, or may exceed, per ton of 2,000 pounds, $2.30 to Fieldale and $2.55 to Danville; and that the assailed rate to Danville from the Kenova, Thacker, and Kanawha districts was and is unreasonable to the extent that it exceeded or exceeds $2.80 per ton of 2,000 pounds.

"We further find that complainants made shipments as described and paid and bore the charges thereon; that they have been damaged thereby in the amount of the difference between the charges paid at the rates herein found to have been unreasonable and those which would have accrued at the rates herein found to have been reasonable; and that they are entitled to reparation, with interest. Complainants should comply with Rule V of the Rules of Practice, and the statements thereunder may include shipments made since the complaints were filed, accompanied by affidavit that complainants paid and bore the freight charges thereon. If defendants object to this method of proof, a further hearing in respect thereof may be requested."

Thereafter, as ordered, further hearings were had for the purpose of ascertaining the details of all shipments made, charges paid, etc., in order to arrive at the exact amount of reparation due. After such hearing was had, the Commission filed a final report on April 27, 1935, in which it referred to its report of January 30, 1933, and its findings therein and stated the agreement that complaints Nos. 25947 and 25947 (Sub-No. 1), which had come on

meanwhile, were to be decided on the same evidence. It proceeded to consider exceptions relating to reparations on various shipments, some of which it excluded and some of which it allowed. The report again concluded:

"We find that the rate over interstate routes from the base group of the Chesapeake & Ohio, Virginian and Norfolk & Western in Virginia and West Virginia, to Danville, Chatham, Blairs, Axton, and Gretna was unreasonable to the extent that it exceeded $2.55, and that the rate to those points from the differential districts was unreasonable to the extent that it exceeded $2.80.

"We further find that the rates from the Pocahontas group on the Norfolk & Western, and from the Thacker district to East Radford, were unreasonable to the extent that they exceeded $1.70, and $1.95 respectively; and that the rate from the Pocahontas district in West Virginia to Pulaski was unreasonable to the extent that it exceeded $1.80.

"As stated in the report, the rates to certain of the destinations here involved are now on the bases specifically prescribed thereto in the several cases cited. The rates assailed to the intermediate points were voluntarily made the same as the rates prescribed to the points beyond, and from the differential districts the rates were also reduced to preserve the previous relation between the several districts. We therefore further find that the present rates are not unreasonable.

"We further find that intervener P. Lorillard Company, Incorporated, and complainants listed in the appendix or their assignors, except those complainants hereinbefore referred to in whose behalf no testimony was introduced, received shipments as described and paid or bore, or paid and bore, the charges thereon at the rates found unreasonable; that they have been damaged thereby in the amounts of the differences between the charges paid or borne and those which would have accrued at the rates found reasonable; and that such intervener and complainants are entitled to reparation with interest in the amounts shown opposite their respective names in the order entered herein."

■ It will be seen that these reports contained findings on all of the essential facts upon which the determination of the Commission had been invoked. A recital of the same facts in the final order was not necessary and would, I presume, have been unusual. The findings and conclusions of courts and other tribunals are usually set out in opinions or reports and, in this case, the order specifically referred to the reports. The contention that the findings of fact are not sufficient to support an award of reparation is without merit.

■ The second of the defenses is that the order of the Commission is not supported by substantial evidence of record. On the trial there was introduced substantially all of the evidence on which the Commission had acted in order, as counsel for defendants stated, "that the court may see all that was before the Commission". It would be impracticable to attempt to describe the nature of all this evidence or to analyze its substance or effect. It comprises, among other things, some 475 typewritten pages of testimony taken orally before an examiner of the Commission on the original complaint, as well as some 98 pages of testimony similarly taken on the question of determining shipments made and charges thereon for the purpose of arriving at the amount of reparation. In addition there are numerous maps of the rate territory and comparable territories; tables showing the chronological history of rates in the territory; tables of comparable rates; numerous reports of the Commission in other (presumably comparable) cases; and much other matter not necessary to detail. It seems to the Court that only a person trained in constant dealing with such matters could assimilate the complete and accurate effect of this mass of material. This fact in itself would accord to the findings of unreasonableness made by the Commission a weight which would cause the Court to hesitate to disturb them, even were the power to review them not limited. But this power is most sharply limited. The following excerpts from the opinion in Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472, indicate what the Court understands to be the effect of a Commission finding of unreasonableness: It is said (230 U.S. at page 257, 33 S.Ct. at page 920, 57 L.Ed. 1472): "But where the suit is based upon unreasonable charges or unreasonable practices, there is no law fixing what is unreasonable and therefore prohibited. In such cases the whole scope of the statute shows that it was intended that the Commission, and not the courts, should pass upon that administrative question."

And further on page 258 of 230 U.S., page 921 of 33 S.Ct., 57 L.Ed. 1472, in speaking of orders of the Commission, it is said:

"Such orders, so far as they are administrative, are conclusive, whether they relate to past or present rates, and can be given general and uniform operation, since all shippers who have been or may be affected by the rate can take advantage of the ruling and avail themselves of the reparation order. They are quasi judicial and only prima facie correct in so far as they determine the fact and amount of damage,—as to which, since it involves the payment of money and taking of property, the carrier is, by § 16 of the act, given its day in court and the right to a judicial hearing. * * *

"In considering the administrative questions as to reasonableness, the elements of the problem are the same, whether they involve the validity of obsolete allowances, discarded tariffs, or current rates and practices."

And see United States v. Louisville & N. R. Co., 235 U.S. 314, at page 320, 35 S.Ct. 113, 59 L.Ed. 245. In conformity with the above cases, and citing them, the Circuit Court of Appeals for the Fourth Circuit, in South Carolina Asparagus Growers' Ass'n v. Southern R. Co., 64 F.2d 419, at page 421, says: "The commission's administrative finding, fixing the extent to which the rates charged were unreasonable, is binding upon the courts."

And see, by the same court, Baltimore & O. R. Co. v. Brady, 61 F.2d 242, 246.

In this case a mass of evidence was before the Commission on the question of reasonableness of the questioned rates. It cannot be said that it acted without evidence or upon no substantial evidence. We are not here concerned with whether this Court, in the exercise of an independent judgment, would have reached the same conclusion as the Commission. Where that body has exercised its judgment in a matter entrusted to it by law, and upon substantial evidence before it, this Court cannot undertake to review that judgment.

The third of the enumerated defenses is that the findings of fact in the Commission's report require a determination that the rates assailed were not unreasonable in the past and the fourth defense is that the evidence before the Commission requires determination to the same effect and that none of the complainants are entitled to reparation. While one of these refers to the effect of the findings of fact and one to the evidence, the effect of both is the same, namely, that the Commission reached an erroneous conclusion in holding the rates to be unreasonable. This necessarily invites an attempt on the part of the Court to weigh the effect of the evidence on which the Commission based its conclusion, and to exercise an independent judgment on the question of reasonableness, something which, as previously shown, the Court is without authority to do.

The defense which is most earnestly urged and raises the most difficult question is the fifth, which asserts, in effect, that the assailed rates and similar rates had received the previous approval of the Commission; that they had been long maintained without complaint by shippers and compared favorably with other rates in the same general territory; that this prior approval, favorable comparison with other rates, and long maintenance without complaint were proper guides to the defendants in determining the reasonableness of their rates and upon which they had a right to rely to the extent of not thereafter being held for reparation. And that for these reasons the Commission was without authority to hold the rates unreasonable in the past and order reparation.

The defendants based their contention here upon the case of Arizona Grocery Co. v. Atchison, T. & S. F. R. Co., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348, and upon what they assert is the proper interpretation and effect of that case. While argument in briefs and orally has taken a wider range, it comes in the end to a question of the authority of the Commission to award reparation growing out of a rate which, so the carriers contend, had received the prior approval of the Commission and which had been long maintained in reliance upon that approval.

It may be said in passing that the fact that a rate has been in effect and that a large volume of traffic has moved under it without complaint is not conclusive that the rate is not unreasonable. It is true that where a rate is in effect and no one from whom the rate charged is exacted complains of it, the very absence of any complaint would indicate that the shipper was satisfied that he was not being

unreasonably charged. And the longer this condition continued the stronger would be the evidence that the rate was not unreasonable. But if the payment by shippers, for any substantial period, of a rate fixed by a carrier were to preclude inquiry into its reasonableness we would have an effective barrier to changes in rates and to reparation, for the latter at least is based only on what the shipper has previously paid out under the rate. The claim for reparation would be defeated by the very fact that the payments made by him and for which he claimed reparation were proof that the rate was reasonable. That the Commission in determining the reasonableness of a rate may consider the period over which it has been maintained, the uncomplaining acquiescence of shippers in it, its similarity to other rates, I have no doubt. And I have no doubt that the Commission does so. But this determination, upon whatever proper evidence or considerations based, is a matter for the Commission. And the Court would not be justified in interfering with it, in the absence of other considerations or conditions affecting the Commission's authority.

The Arizona Grocery Co. case, supra, involved consideration of other conditions which the court held did limit the right of the Commission to award reparations and the defendants here, conceding that this case is not within the exact factual limits directly before the court in that case, contend that the principle of that case is applicable here and requires a similar result. In the Arizona Grocery Co. case, the Court, reciting the power of the Commission to fix rates, held that when the Commission has fixed a named rate or the maximum and minimum limits of a reasonable rate, a carrier is entitled to rely upon this as a declaration of what will be a lawful, that is, a reasonable rate, and if the carrier conforms to the prescribed named rate or a rate within the prescribed limits, as the case may be, it cannot be held to pay reparation on a future complaint and finding that the rate is unreasonable. In the case mentioned, the specific facts were, briefly stated, that a rate of $1.045 had been complained of and upon a hearing the Commission, in June, 1921, held that the rate had been, and for the future would be, unreasonable to the extent that it exceeded 96.5 cents, and ordered the establishment of a rate not exceeding 96.5 cents. The carriers conformed to the order and promulgated

a rate of 96 cents, which they later voluntarily reduced to 86.5 cents and still later to 84 cents. Subsequent to this, in February, 1925, approximately four years after the order prescribing the maximum rate of 96.5 cents, the Commission filed a report prescribing for the future a maximum reasonable rate of 71 cents. Several years later, in a proceeding brought by shippers claiming reparation, the Commission held that the rates charged (86.5 and 84 cents), from and after July 1, 1922, had been unreasonable to the extent that they exceeded 71 cents from certain origins and 73 cents from others, and awarded reparation on that basis upon shipments made between February, 1923, and February, 1925. It will be noted that the reparations were on shipments made between the date of the first order prescribing a maximum rate of 96.5 cents and the second order prescribing a maximum rate of 71 cents.

The opinion of the Supreme Court sets forth with care and clarity the rights and obligations of carriers as to rates as affected by the creation of the Interstate Commerce Commission and successive enlargement of its powers. It points out the distinction between rates prescribed by the Commission, either specific or within named limits, and rates named by the carrier. It emphasizes that the functions of the Commission are of a dual nature; that in prescribing rates for the future it is acting in a legislative capacity and its pronouncements have the force of statute; but that when sitting to award reparation for charges illegally (unreasonably) made in the past, it is exercising a judicial function. Briefly stated, the Court held that when the Commission held that 96.5 cents was, and for the future would be, a reasonable (and therefore lawful) rate, the carrier was bound to conform to this pronouncement and, as respects its future conduct, was entitled to rely upon the Commission's declaration that in doing so it was maintaining a lawful (reasonable rate). That the Commission undoubtedly had power to prescribe further reductions from time to time as affecting future conduct, but that having prescribed a maximum rate to which the carrier had conformed, the Commission thereafter, sitting in its judicial capacity, was bound to recognize the validity of its own enactment and not to repeal it with retroactive effect. That having, as a legislative body, enacted a rule of conduct for the carrier it might thereafter amend this enactment so far

as it affected the carrier's conduct for the future; but that it could not, as a judicial body, repeal its enactment with retroactive effect and penalize the carrier for actions done in strict conformity to the enactment which the Commission had made and compelled the carrier to follow.

It will be noted that the Arizona Grocery Company case deals with and reaches its conclusions with reference to a Commission-made rate, i. e., a rate, the limit of which was specifically fixed by the Commission. This case was decided by the Supreme Court on January 4, 1932, and affirmed a decision of the Circuit Court of Appeals (9 Cir.) rendered March 23, 1931, 49 F.2d 563. The Circuit Court of Appeals emphasized that the rate in question had been fixed by the Commission and (49 F.2d at page 568) states that there is a clear distinction between Commission-made rates and those established by the carrier.

On September 4, 1931, there was decided by the Circuit Court of Appeals of the Fifth Circuit the case of Eagle Cotton Oil Co. v. Southern R. Co., 51 F.2d 443. In the decision of this case, the Court had before it the opinion of the Circuit Court of Appeals in the Arizona Grocery Company case but not, of course, the Supreme Court's affirmance. In the Eagle Cotton Oil case, the same contention was made as in the Arizona Grocery Company case, namely, that the rates out of which reparation was ordered had been prescribed by the Commission. But it will be seen that there is a substantial difference in the cases in the manner or course of events by which the Commission is alleged to have previously prescribed the rate.

The facts in the Eagle Cotton Oil case and those before this Court are quite similar. In the instant case, the defendant traces the history of rate changes from the year 1915 until the present, as a result of which the rate now in issue was arrived at. These show that in 1915 the Commission specifically prescribed a rate to Danville of $2.10. Thereafter, in July, 1917, under authority of the Commission's decision in what is known as the Fifteen Per Cent case, allowing carriers to increase all coal rates, the rate was increased to $2.20. In December, 1917, the railroads went under control of the Government and, in May, 1918, General Order No. 28 of the Director General of Railroads increased this rate to $2.70. When the railroads were returned to their owners in March, 1920, it was provided that then existing rates should continue in effect until thereafter changed pursuant to law, but that no reduction should be made prior to September 1, 1920, 41 Stat. p. 464, 49 U.S.C.A. § 76. In the summer of 1920 the Commission had before it the application of carriers for a general increase in rates in the proceedings known as Increased Rates, 1920, 58 I.C.C. 220, 302, 489. The increases sought, which were general both as to territory and commodities, were sought and were granted with a view of enabling the carriers to make the fair return upon the value of their properties, which the Government had guaranteed. Under the increases granted, the rate to Danville was increased to $3.60. In July, 1922, as a result of the Commission's report in the proceedings known as Reduced Rates, 1922, 68 I.C.C. 676, there was a general reduction of rates and, under this, the rate to Danville was reduced to $3.09. In 1925, a complaint on rate charges was filed by the Corporation Commission of the State of North Carolina which apparently either involved this territory or was thought to be of such nature as would thereafter bring in question the Danville rate. In any event, as a result of the complaint, the carriers agreed to reductions without an order of the Commission and under this the rate to Danville was reduced to $2.89, where it stood until the proceedings here involved, when it was reduced to $2.55. The reparation sought is on the basis of the reduction from $2.89 to $2.55.

In the Eagle Cotton Oil cases, the historical development of the questioned rates was set out as it is here and, in large measure, the increases and reductions from time to time were based on the same authority, namely, the war-time increases, the 1920 Increased Rates proceedings, the 1922 Reduced Rates proceedings. The contention there, as here, was that as a result of these successive orders by the Commission, the rate was one which, in effect, had been fixed and prescribed by the Commission. After discussing the effect of the various changes in the rate, the Court (C.C.A.) held that the rate was not one prescribed by the Commission but was a carrier-made rate out of which reparation could be awarded. The Court mentioned the Arizona Grocery Company case (which had not then been decided by the Supreme Court) but pointed out that that decision rested on the theory that the rate involved was Commission-

made. In the Cotton Oil case certiorari was applied for but was denied. 284 U.S. 675, 52 S.Ct. 130, 76 L.Ed. 571.

It is the contention of defendants that the holdings of the Supreme Court in the Arizona Grocery Company case were such as were not necessarily confined to the exact factual situation in that case but that it laid down a principle equally applicable to the situation here where, it is contended, the rate was in effect fixed under the compulsion of the Commission's orders. It is urged that the refusal of certiorari in the Cotton Oil case imports no expression of opinion on the merits of that case and leaves open the questions here raised.

Since the Supreme Court decision in the Arizona Grocery Company case, the question here involved has been before the lower courts in at least several jurisdictions. In Pitzer Transfer Corp. v. Norfolk & W. R. Co., D.C.Md., 10 F.Supp. 436, 438, an able opinion discusses with great clarity the distinction between the legislative and judicial functions of the Commission and between Commission-made and carrier-made rates. It also held that there had been no definite prescription of a rate by the Commission, and that in making a previous finding "that the rates assailed are not unreasonable or otherwise unlawful", the Commission was acting in its judicial capacity and that this did not constitute legislative action by which the carrier was bound for the future and which it could invoke as a justification for the rate charged. The Court says, 10 F.Supp. at page 441: "We must remember that if, as we find the case to be, the rates here dealt with were carrier made and not commission made rates, there was no lack of authority on the part of the Commission in passing the reparation orders. Even though the carriers reasonably believed that their rates were reasonable, nevertheless, as at common law, they took the risk of a judicial determination to the contrary."

The Court mentions that the contentions of the carriers were the same unsuccessfully raised in the Eagle Cotton Oil case and, after discussing that case, as well as the Arizona Grocery Company case, concludes that the holding in the latter could not be extended to cover the situation before it; emphasizing that the Arizona Grocery Company case was confined to rates prescribed by the Commission in pursuance of its legislative functions.

Again in the cases of Corray v. Baltimore & O. R. Co., D.C., 2 F.Supp. 829, and Jones v. Alton & S. R. Co., D.C., 6 F.Supp. 807, both in the Eastern District of Illinois, the effect of prior approval of rates, as related to the right to reparation, was considered. Here again it was held that the doctrine of the Arizona Grocery Company case was to be confined to cases where the Commission had in its legislative capacity prescribed a rate for the future and did not apply where, acting judicially, it had considered and passed on the reasonableness of a prior rate. In Jones v. Alton & S. R. Co., D.C., 6 F.Supp. at page 810, the Court expresses the view that: "The test laid down by the Supreme Court for determining whether the Commission has lost jurisdiction to award reparation is whether it has specifically prescribed a specific rate for the future by legislative order." Citing Brimstone R. & Canal Co. v. United States, 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487; Great Northern R. Co. v. Sunburst Oil Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360, 85 A.L.R. 254.

I am unable to distinguish this case from the Eagle Cotton Oil case. As before stated, the carrier there relied on practically the same history of changes in rates over a period of years as is set out here and, beginning with a prescribed rate in 1915, it was argued that these changes made under authority of Commission orders and resulting in the challenged rate made this latter rate one, in effect, prescribed by the Commission. That is the argument here. It is contended that, beginning with a prescribed rate of $2.10 in 1915 and ending with the rate of $2.89 found unreasonable in this proceeding, all changes in rates were in effect prescribed by the Commission in that the modifications were made under authority or compulsion of Commission orders. I am unable to take this view. There were several occasions during these years, if the Court correctly interprets the effect of the Commission's order, when the opportunity to fix rates existed in the defendants and was exercised by them. The rate prescribed in June, 1915, was, as then provided by statute, effective for only two years. Its compulsion expired thereafter. The next step was the general increase granted carriers of coal, effective July 1, 1917, in the Fifteen Per Cent case and while the Court is not certain whether this was put into effect during the two-year life of the pre-

scribed rate or a month or so after its expiration, it is nevertheless true that this general increase prescribed no definite rate and was utilized by the defendants after the former definitely prescribed rate had expired. The succeeding changes which have been detailed were made pursuant to orders of the Commission, general in their nature, applying percentage increases or reductions and affecting many carriers and many commodities. In none of them was a definite rate prescribed for the carriage here involved. By 1925 the rate here had become $3.09, and at that time was reduced to $2.89, not by order of the Commission, but by the carriers, acting to satisfy shippers who had filed or were about to file complaints. This action has received only brief comment from counsel and perhaps the Court magnifies its significance. But it would appear that, if the rate of $3.09 was one prescribed by the Commission in the maintenance of which the carriers were protected from any reparation, they would have preferred to let the Commission pass upon it rather than to have made a voluntary reduction in a substantial amount. They may have feared that Commission action might result in a larger reduction for the future than that to which they voluntarily consented, but this would indicate, at least, that they recognized that the reasonableness of the rate was open to question and probable adverse ruling.

And this view would have been not inconsistent with the Commission's previous actions increasing (in 1920) and later reducing (in 1922) this rate. As stated before, the increases granted in 1920 were general to the carriers throughout the country and on a percentage basis; as were also the reductions in 1922. Neither of them specified particular rates. In the report in Increased Rates, 1920 (Ex parte 74), 58 I.C.C. 220, at page 246, it is recited that the percentage increases thereinafter set out, are such as "would under present conditions", enable the carriers to earn 5.5% on their aggregate value and would result in rates not unreasonable.

In Reduced Rates, 1922, 68 I. C. C. 676, at page 734, the Commission reports that after March 1, 1922, a fair return on the value of the carriers will be 5.75%; and that freight rates increased in 1920 "will be, on and after July 1, 1922, unreasonable to the extent that they include more than the following percentages of increase over the rates in effect immediately prior to August 26, 1920". Followed by a designation of the percentages for the respective territorial groupings.

It will be noted that in each instance the Commission mentioned rates which under the then existing conditions would appear not unreasonable and allow a fair return, and this was based upon lengthy discussion of conditions shown as to amount of traffic, costs of operation, etc. It does not appear that the action of the Commission in such general terms had the effect of relieving the carriers of their duty to make future adjustment of rates in the light of changes in conditions which might occur in the future and in the light of which the rates might well be considered unreasonable. In other words, the carriers could not rely on the action of the Commission as giving them a free hand to continue the rates unaltered until further orders of the Commission, but were required to conform to their historical duty of charging no more than was reasonable or running the risk of suffering the penalty for overcharging. It would seem that the carriers appreciated the situation when they made the voluntary reduction to $2.89, but that this reduction was not sufficient to meet the views of the Commission as to what was a reasonable rate when complaint was later made.

Defendants have contended that what is termed Fourth Section Order 10533, entered by the Commission on January 29, 1931, definitely approved the $2.89 rate as reasonable. Lengthy argument by counsel on both sides has been devoted to the effect of this order. The reference is to Section 4 of the Interstate Commerce Act, 49 U.S.C.A. § 4, dealing with long and short haul charges and providing generally that it shall be unlawful to charge greater compensation for a shorter than for a longer distance over the same line, but providing that in special cases, the Commission might authorize a less charge for a longer than for a shorter distance and prescribe the extent to which a carrier might be relieved of the operation of this section of the statute. The effect of the Commission's action in granting this special relief by its order 10533 was, so far as this case is concerned, to permit the carriers to maintain their existing rate to Martinsville, Va., and their slightly higher rate to Danville, an intermediate point. The order itself does not name or prescribe the rates and it appears that the extent of its effect is that a proper

showing has been made for the allowance of an exception to the long and short haul clause and to permit the exception to operate. But the order would seem to disclaim any approval of the reasonableness of existing rates by its use of the following language: "The Commission does not hereby approve any rates that may be continued under this authority, all such rates being subject to complaint, investigation and correction if in conflict with any provisions of the interstate commerce act."

As to the contention that the Commission has passed on and approved similar rates, it can only be said that it is not within the authority of this Court to compare other rates with that questioned and determine whether the Commission's findings are consistent. We might arrive at the view that the other rates were also unreasonable. In Virginian R. Co. v. United States, 272 U.S. 658, 47 S.Ct. 222, 225, 71 L.Ed. 463, it is said: "This court has no concern with the correctness of the Commission's reasoning, with the soundness of its conclusions, or with the alleged inconsistency with findings made in other proceedings before it."

It follows from what has been said that the Court is of opinion that the rates in question had not been prescribed by the Commission but were rates voluntarily established by defendants and were not maintained under any order of the Commission. And the Court so finds.

The Court further is of opinion, and so finds, that the report and order of the Commission of April 27, 1935, were made in the course of proceedings regularly conducted before the Commission and were based on substantial evidence before the Commission; and that it was within the authority of the Commission to order a reduction of the rates for the future and also to award reparation based on charges found to be unreasonable in the past.

The plaintiffs have tendered a request for findings of fact and conclusions of law at great length. Inasmuch as the views of the Court fully appear in the course of this lengthy opinion and much of the matter in the request is merely formal and undisputed, no further statement of findings by the Court seems necessary and would be an encumbrance.

The plaintiffs will have judgment for the amounts due them respectively as prayed for in their complaints, with the reservation that the Court may consider further the matter of computation of interest on the amounts due; this, together with enumeration of the specific sums due will be fixed by the final order.

Plaintiffs, under the right given by the statute under which these actions are brought (49 U.S.C.A. § 16(2)), have asked for the allowance of attorney's fees to be taxed as part of the costs. In case No. 3698, the aggregate amount for which judgment is sought is something over $175,000; in case No. 3699, it is slightly over $15,000. In the first case, an allowance of not less than $45,000 is asked for fees; in the second case, an allowance of not less than $4,000.

In both cases, the sums requested are decidedly too large. It is well settled that in the allowance of fees in such cases, the allowance should be confined to services connected with the suit before the Court and it is not intended that it should cover services rendered in the proceeding before the Commission out of which the reparations were awarded. Meeker v. Lehigh Valley R. Co., 236 U. S. at page 432, 433, 35 S.Ct. 328, 59 L.Ed. 644, Ann. Cas.1916B, 691; Mills v. Lehigh Valley R. R., 238 U.S. at page 482, 35 S.Ct. 888, 59 L.Ed. 1414.

I have little doubt that counsel for plaintiffs have adequate arrangements with their clients for payment for their services before the Commission. And so far as presenting the merits of the case from a factual standpoint is concerned, most of the work was done there. The service in this Court consisted in presenting the prima facie case based on the Commission's report and order and in defending this prima facie case against the legal assaults of the defendants. This they have successfully done, and the briefs clearly indicate the large amount of time and the able effort involved in their preparation. It is true also that the values involved are large. Nevertheless, I feel that the requested allowances should be substantially reduced and that a fee of $18,000 in case No. 3698 and one of $2,000 in case No. 3699 would be proper.

During the trial of the case objections to the admission of evidence were taken from time to time, and in each instance, the court, reserving action on the objection, allowed the evidence to be presented. That there may be no confusion on this point, the Court states that all such objec-

tions were overruled and the Court treated all evidence presented as pertinent and proper and considered the same.

## Memorandum by the Court on the Matter of Interest

In the previous opinion of the Court holding that complainants were entitled to judgment for the amount sued for, the Court left open for further consideration the matter of the allowance of interest on the amount of the reparations ordered, as part of the final judgment. This matter has now been argued by counsel.

It is contended by complainants that interest should be allowed on the amounts ordered to be paid by the Interstate Commerce Commission from the date fixed by the Commission for its payment, namely, July 27, 1935; and that interest should be at 6%, the legal rate in Virginia.

The defendants contend that there is no compulsion upon the Court to allow interest; that it is within the Court's discretion. As an objection to the allowance of interest, they point out that the amounts which the Commission ordered paid included interest on the freight charges paid by the claimants from the dates of payment' and that the allowance of interest on the amounts sued for would, therefore, be the compounding of interest. In any event, they contend, any allowance of interest should not be at a rate as large as 6%; their position being that in ordinary commercial transactions over the last five or six years money has been available at substantially less than 6% and that complainants would reap a substantial profit if they were allowed 6% interest. The defendants do not deny the power of the Court to award interest except, perhaps, so far as it may represent compound interest in the manner set out above, but they contend that it would be inequitable to allow it in this case, and particularly so to the extent of 6%.

A matter for first consideration is as to the nature of the action before the Court. The complainants contend that the Commission, in directing the payment of reparations and fixing the amounts thereof, is acting in a quasi-judicial capacity and that its order has the effect of liquidating and determining the amount due and that the action in this Court is in effect one to enforce an award made by proper authority; it is strongly implied, if not directly stated, that the Court is compelled to allow interest at the legal rate from the date of the Commission's award.

The defendants assert that the action here is merely a suit in tort for damages, the trial of which is subject to the condition that, by provisions of the statute, the report and order of the Commission shall be prima facie evidence of the facts therein stated; that the action is subject to all the limitations and to the principles of law applicable to any action in tort.

The reported cases disclose that the courts have had difficulty in arriving at a uniform agreement as to the principles of law attending upon and controlling actions of this sort, due in large measure, I think, to the lack of an exact definition of the status and effect of the Commission's order. But it is clear, I think, that there is no sound authority for going so far as complainants contend. On the contrary, the accepted view is that these are actions at law for damages for a tort, which (as provided in the statute itself, 49 U.S.C.A. § 16(2), "shall proceed in all respects like other civil suits for damages * * *", and in which the plaintiff, as in any other suit, is required to prove the fact of damage and the amount thereof. The plaintiff is aided in presenting his case by the special rule of evidence which gives prima facie verity to the findings and order of the Commission, but this does not alter the essential nature of the action.

In Lewis, etc., v. Southern Pacific Co., 283 U.S. at page 660, 51 S.Ct. at page 595, 75 L.Ed. 1333 it is said: "The act does not create a cause of action based on the Commission's findings and reparation order for the recovery of money collected as freight charges based on rates alleged to be unjust and unreasonable. It makes a determination by the Commission of the unreasonableness of the rate attacked and the extent that it is, if at all excessive, a condition precedent to suit."

After reciting the statutory provision that the suit shall proceed "like other civil suits for damages" except for the effect given the Commission's findings as prima facie evidence, the opinion states (283 U.S. page 661, 51 S.Ct. at page 595, 75 L.Ed. 1333): "It is clear that the action is not on the award as such. Meeker v. Lehigh Valley R. Co., 236 U.S. 412, 430, 35 S.Ct. 328, 59 L.Ed. 644, Ann.Cas.1916B, 691." In the Meeker case, it was held that the shipper must prove the loss which he has suffered

in order to recover it and, of the statutory provision giving prima facie effect to the Commission's findings, it is said [236 U.S. 412, 35 S.Ct. 335, 59 L.Ed. 644, Ann.Cas.1916B, 691]: "This provision only establishes a rebuttable presumption. It cuts off no defense, interposes no obstacle to a full contestation of all the issues, and takes no question of fact from either court or jury. At most, therefore, it is merely a rule of evidence."

The true nature of these cases, therefore, appears to be that they are actions for damages occasioned by the tortious acts of the carriers in which, as in all other like cases, the complainant is compelled to prove the tortious act, the fact that he was damaged thereby and the amount of such damage, and in which he is aided in making such proof by a rule of evidence which permits him to introduce the findings of the Commission as prima facie evidence of such facts.

Some of the confusion as to the effect of the Commission's finding of a definite amount of damage has probably grown out of the fact that in these cases there is rarely any dispute as to the amount of reparation due, if any is due. The Commission having carefully checked the figures involved in the payments made for freight charges, their accuracy is rarely disputed. The questions raised in the District Courts ordinarily relate to questions involving the right to grant any reparation at all and not to the amount of the reparation granted. The findings of the Commission on the question of amount is practically never disputed and rarely can be successfully disputed, with the result that in practical operation the complainant needs merely to show the Commission's finding to establish the amount of his damage. The repeated happening of this condition seems to have created an impression (seemingly held by complainants here) that actions in court are merely to enforce an award for damages previously liquidated and determined. But such is not the true nature of these actions.

See the cases of Baltimore & O. R. Co. v. Brady, 61 F.2d 242, and South Carolina Asparagus Growers' Association v. Southern R. Co., 61 F.2d 419, both decided by the Circuit Court of Appeals for this (4th) circuit, in which it is held that the amount of damage awarded by the Commission is open to attack in court by either party. In the first named case, which contains a particularly full discussion of the principles involved, the plaintiff sued for and recovered an amount largely in excess of that awarded by the Commission. In the second case, the defendant successfully contested the amount of damages as evidenced by the Commission's award.

█ Both parties here cite the case of Louisville & N. R. Co. v. Sloss-Sheffield Steel & Iron Co., 269 U.S. 217, 46 S.Ct. 73, 70 L.Ed. 242, on their respective contentions. The portion of the opinion in that case pertinent to the questions here is brief (269 U. S. at pages 238–240, 46 S.Ct. 73, 70 L.Ed. 242) but is, I think, illuminating. I interpret the language of the Court to express the view that the Commission has the right to include interest on the freight charges paid from the date of their payment, as an element of the damage suffered by the shipper, that it customarily does so, and that the Court sees no reason to condemn the practice. But it does not appear that the Court considered that the allowance of such interest is required. As to the contention that, when the District Court allowed interest on the amount found due by the Commission, which was in part made up of interest, the action of the District Court amounted to the allowance of compound interest, the Court conceded that this was the result but found no error because of it. The reason behind this latter view, as I understand it, is that the amounts of interest included in the Commission's finding was an element of the damage which the Commission found had been suffered. In other words, the Commission, in performance of its function to find the damage which the shipper had suffered, determined the amount of the excess charges and then found that in order that the shipper might be made whole it should be allowed a further sum measured by interest on the amounts of the excess charges; the two amounts together representing the extent to which the shipper had been damaged as of the time of the Commission's finding and order. I think it clearly implied that it was within the power of the commission to have found that the damage for which the shipper was entitled to reparation was adequately measured by the amount of the excess charges, without the allowance of any additional amount, if it had held such a view.

█ It would appear, therefore, that any interest allowed by this Court would not come within the inhibition or disfavor

attached to compound interest, but is to be treated as interest upon the total amount of damages found by the Commission to have accrued. If this theory be correct, then any contention that an allowance of interest by this Court would be erroneous as violating the prohibition against compound interest is untenable; and this was specifically held in the Sloss-Sheffield case. Indeed it may be said that defendants appear to urge this question rather because of the equities involved than because of faith in their strict legal position.

While the case of Louisville & N. R. Co. v. Sloss-Sheffield Steel & Iron Co., supra, did not require an answer to the question of whether the District Court had the power to deny any allowance of interest on the amount directed by the Commission to be paid in reparation, I think the implication is that it had such power. The language of the opinion, as well as the accepted status of the Commission's findings, imply that the allowance or non-allowance of interest, either by the Commission or by the District Court, are matters within the discretion of those respective tribunals, depending upon the consideration of adequately compensating the shipper for the damage done him.

If it be true, as the Court has previously expressed its belief, that these cases are actions in tort for unliquidated damages, then the view that the allowance of interest by this Court is discretionary is consistent with the long line of Federal authority. In Lincoln v. Claflin, 7 Wall. 132, 139, 19 L.Ed. 106, the Court said: "Interest is not allowable as a matter of law, except in cases of contract, or the unlawful detention of money. In cases of tort its allowance as damages rests in the discretion of the jury."

(Note: In Louisville & N. R. Co. v. Sloss-Sheffield Steel & Iron Co., Mr. Justice Brandeis said (269 U.S. at page 240, 46 S.Ct. at page 81, 70 L.Ed. 242) specifically that the basis of liability of the carrier is "not the withholding of the excess unlawfully exacted" in freight charges.)

See also Mowry v. Whitney, 14 Wall. 620, 653, 20 L.Ed. 860, and Miller v. Robertson, 266 U.S. 243, 258, 45 S.Ct. 73, 78, 69 L.Ed. 265, where it is said: "Generally, interest is not allowed upon unliquidated damages. Mowry v. Whitney, 14 Wall. 620, 653, 20 L.Ed. 860. But when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages." Citing various cases.

The general rule above stated is embodied in a statute of the State of Virginia (Virginia Code Sec. 6259) which makes the discretionary allowance of interest applicable to actions on contract as well. It reads in part: "In any action, whether on contract or for tort, the jury may allow interest on the sum found by the verdict, or any part thereof, and fix the period at which the interest shall commence. If a verdict be rendered which does not allow interest, the sum thereby found shall bear interest from its date, and judgment shall be entered accordingly."

Counsel are in agreement that the Virginia law is controlling on the question at issue, although differing upon the construction of the Virginia law. However, the language of the statute is definite and makes it clear that, conforming with the general rule, the allowance of interest in an action of tort is discretionary with the trier of facts (in this case the Court). This statute is discussed in Jones v. Foster, 4 Cir., 70 F.2d 200, 206, 207, in which the action of this Court in instructing the jury to allow interest from a named date was held erroneous.

In that case, the Court said that the situation before it was not one "where a sum certain is * * * definitely due and payable on a certain date to which interest attaches ordinarily from maturity by implication". The plaintiffs urge that this amounted to a holding of the Court that in a case answering the quoted description interest should be allowed as a matter of law, and insist that the case at bar is such a case. In the first place, it may be said, that I do not construe the opinion in Jones v. Foster to make any such unconditional holding as counsel urge. In the second place, the case of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, more recently decided, now compels conformity by this Court with the Virginia law; and under the broad terms of the Virginia statute, it seems that the allowance of interest is not required as a matter of law except where contracted for; and in such latter case the compulsion exists by virtue of the contract sued on.

But, as previously stated, I am of opinion that the action here is not one "where a sum certain is definitely due and payable on a certain date", as on contract or to enforce a judgment previously obtained; but on the contrary is an action in tort for damages. Under such circumstances, the allowance of interest is, under the terms of the Virginia statute, plainly within the discretion of the trier of fact.

The next question is whether the Court should allow interest. The amount of the judgment in any suit for damages (except where punitive damages are assessed) is designed to compensate the plaintiff for the loss which he has suffered—to make him whole. In the instant case, the plaintiffs have proven damages in the amount in which the Commission found them to be damaged as of the date of the Commission's order. In its discretion, the Court may allow interest on this sum or any part thereof if it deems such allowance necessary in order adequately to compensate the plaintiffs. I think such an allowance should be made. Due to some delay in submission of the case and an even greater delay in its consideration by the Court after its submission, an unfortunately long time has elapsed in concluding this case. It is now found that the exaction of the unlawful rate caused damage to the plaintiffs accruing approximately five years ago. It seems to me that the plaintiffs would not be fairly and adequately compensated if they are limited to the amount of the damage shown to have existed at such a time, with no allowance for the value or use of the amount of money which would have compensated them at that time but which they did not then receive. At the same time, it is to be remembered that the defendants, in making the excess charges, believed them to be legal. Their defense of the suits against them has been in good faith. At no stage of the entire matter has their conduct or attitude been other than an attempt to defend rights which they believed themselves to have. There is no justification for a judgment which involves the element of penalty, or of anything other than fair compensation to the plaintiffs. And the plaintiffs have no right to expect more than fair compensation.

This leads then to the only remaining question, namely, whether the Court, having determined that some interest should be allowed, has the power to fix that interest at such a rate as in its opinion is just. Or, in other words, is the Court, in allowing interest, compelled to fix interest at what is commonly known as "the legal rate of interest" or has discretionary power to name a rate lower than the legal rate if of opinion that such lesser rate would be more equitable and make nearer approach to fairly compensating the plaintiffs.

The legal rate of interest, generally speaking, is a rate fixed by statute which is utilized where interest is determined to be properly payable but where it is not fixed by contract. It is also, unless otherwise specifically provided, the maximum rate which may be contracted for. By the Virginia statute (Code of Va., Sect. 5551), which permits no higher rate even by contract, the legal rate is six per cent. It is urged by plaintiffs that any interest allowed must be at the rate of six per cent. This argument, however, accompanies their contention that the action is to recover a sum certain, definitely due and payable as of a certain date, and is not directed to the power of the Court in allowing interest in a tort action, which I have held this to be. I do not think the cases relied on by plaintiffs, Railroad Credit Co. v. Hawkins, 4 Cir., 80 F.2d 818; Schofield v. Palmer, C.C., 134 F. 753; and Boswell v. Big Vein, etc., Coal Co., D.C., 217 F. 822, 823, are pertinent.

In the first named case, the allowance of interest was upon the amount of a corporate dividend in a definite sum and definitely payable, but which was withheld from or not paid to the person entitled thereto. The question was whether or not interest should be allowed on the sum withheld and the Court allowed interest at the legal rate. No question was raised as to the rate of interest. The case of Schofield v. Palmer involved notes or written evidences of debt, some of which prescribed the rate of interest while others did not. As to those notes not specifying a rate of interest, the Court held that the legal rate should apply. In Boswell v. Big Vein, etc., Co., the suit involved promissory notes with a provision for payment of "interest from date at the rate of five per cent. per annum". The question was whether the rate of five per cent continued until payment of the notes. The plaintiff was contending that after maturity, and certainly after judgment, the legal rate of six per cent was applicable. It will be seen that the decision of Judge McDowell holding the five per cent rate applicable rested on language of the lease, for which the notes were consideration, in which the

notes were described as bearing interest "at the rate of 5 per cent. per annum from date *until paid*". The Court also mentioned the provisions of the then Virginia statute (Sect. 3391 of the Code of 1904) reading as follows: "In any suit in equity, or in an action founded on contract, where no jury is impaneled, judgment or decree may be rendered for interest on the principal sum recovered, until such judgment be paid; and where there is a jury, which allows interest, the judgment shall, in like manner, be for such interest until payment."

The Court, speaking of the above statute, and, as I take it, purely by way of dictum, said: "I find nothing in the present statute which gives the court any discretion as to the *rate* of interest. The statute seemingly contemplates that, where interest is properly allowed, it shall be at either the statutory rate or at the (legally) agreed rate. An entire absence of discretion as to the rate of interest tends to support the conclusion that no discretion was intended as to the time *to* which interest, if allowable, should run at the legally agreed rate."

But it will be noted the statute thus above mentioned (Sect. 3391, Code of 1904) was different in terms from the pertinent portion of the present Sect. 6259, heretofore quoted, and that Judge McDowell was discussing interest allowable upon a judgment and not interest which might, in the Court's discretion, be allowed in reaching the amount of the judgment.

It might be said, in passing, that if Judge McDowell was sound in his argument that the absence of discretion as to the rate of interest tended to the conclusion that no discretion was intended as to the length of time *to* which interest should run, then it may be urged with equal force that the provision of the present statute giving discretion as to the time from which interest shall run tends to the conclusion that discretion was intended as to the rate likewise.

However, Judge McDowell had before him a different question than that presented here and he had no occasion to discuss Section 3990 of the Code of 1904, which was the forerunner of those provisions of our present Section 6259, on which the present case turns. Even so, Judge McDowell recognized the possibility that it was not a settled proposition that the rate of interest fixed by a court might not vary from the legal rate even after judgment, for he says: "Even if there be in some cases a dis-

cretion given by the statute to the court as to the time to which and the rate at which interest shall run, there is no discretion whatever in a case such as we have here."

And interest at 5% was allowed as provided in the lease.

It seems obvious that the purpose of the present statute (Sect. 6259) which confirms the general rule of law and permits the allowance of interest in a tort action in the discretion of the trier of fact, is that interest may be allowed when its allowance appears necessary to compensate the plaintiff adequately, i. e. to make him whole; or withheld when its allowance is not necessary to accomplish such purpose. In other words, the allowance of interest or not is to be determined by the equities of the situation before the court. This is indicated not only by the discretionary right to allow interest, but also by the right to determine the time from which interest shall run.

And it is in accord with the modern view relating to interest. See Board of County Commissioners v. United States, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313, where it is said: "The cases teach that interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable."

If it be the purpose of the statute to enable the Court to enter such judgment as will in its opinion make the plaintiffs whole, then there would seem to be implied the right to name such rate of interest as would accomplish the result sought. It does not seem reasonable that in giving the discretionary right to allow interest and to fix the time of its commencement, the Legislature intended that any interest allowed must be at six per cent; that it intended that interest must be allowed at six per cent, or not at all. Such a construction might well defeat the purpose of the statute by allowing the plaintiff more than a proper compensation on the one hand or denying it on the other. The statute itself does not provide this, nor has there been cited to me any statute which so provides.

I think it plain that to allow interest on the amount of reparation ordered by the Commission at six per cent from the date of the Commission's order would more than compensate the plaintiffs. It.

is a matter of common knowledge that for some years past, including this entire period, money has been available at substantially less than six per cent even to the ordinary borrower at bank; and similarly investments promising reasonable safety cannot be found at such a rate. This condition has been recognized by the Supreme Court of Virginia in its comment in Aronovitch v. Ayres, 169 Va. 308, 327, 193 S.E. 524, 530. This was not a case involving the allowance of interest, it is true. It was a case where a verdict for permanent personal injuries in the amount of $20,000 was questioned as excessive. In considering the amount of the verdict from the standpoint of its ability to furnish a compensating income to the plaintiff, the Court justified the size of the verdict, saying in part: "Courts heretofore, in estimating the value of a recovery, have looked to the income which it would produce, estimated usually on the basis of a 6 per cent. investment. Today safe 6 per cent. investments are no longer available. * * * Plaintiff when hurt was 25 years old. His earnings were around a thousand dollars a year. $20,000 at 4 per cent. gives us $800, subject to taxes and to the hazards of investment * * *."

While not pertinent to the question immediately before this Court, this is at least a judicial recognition of the current rate of interest.

■ I think that on an allowance of 6% interest the plaintiffs here would profit from the wrongs done them, which is not intended. Considering the freedom from taxation on the amount involved, including interest, during the years this action has been pending, I think that an allowance of four per cent on the amount named by the Commission will adequately compensate the plaintiffs.

It must be emphasized that the action of the Court is based on the belief that this is an action in tort for unliquidated damages, and that, therefore, the Court has discretion to make such allowance of interest as will, in its opinion, adequately compensate the plaintiffs for their loss and limit them to such fair compensation. Pursuing the theory on which the Court relies, it must also be emphasized that the amount allowed as interest is a sum added to the amount of reparation ordered and entering into and becoming a part of the amount of damages determined by this Court as of the date of its judgment. It is a part of the amount for which this Court will enter judgment; it is not interest on the judgment. After entry of judgment, the amount thereof will bear interest at the legal rate of six per cent. I think the Court has no discretion as to this, and that the Virginia cases make it clear that on the amount of a final judgment interest runs at the legal rate.

■ It is urged that in actions of this sort in other jurisdictions, interest has usually been allowed at six per cent from the date of the Commission's order and that departure from the custom of other courts leads to discrimination as between litigants having the same rights. The argument does not appear to me to be valid. This alleged discrimination might be said to exist where one court, exercising the discretion expressly permitted under Section 6259, made an allowance of interest while another did not. If, because one court allowed interest as part of the damages, all other courts were compelled to follow the same course, then there ceases to be any room for the exercise of the discretion which the statute gives and the whole purpose of the statute would be nullified. No court can undertake to base its conclusions of fact upon those of another court in another case. This Court is charged with the duty of determining the fact of the amount of damages which the plaintiffs have suffered. It must do that through the exercise of its own judgment on the facts before it. It is my opinion that the plaintiffs will be fairly and adequately compensated by a judgment made up of the amount of the reparations ordered by the Commission with interest on that amount at the rate of four per cent from July 27, 1935, until now.